Sandra Kay PALMER, Plaintiff,

v.

UNIVERSITY MEDICAL GROUP, and Standard Insurance Company, Defendants.

Civil No. 96–1320–JE.

United States District Court, D. Oregon.

Jan. 16, 1998.

Alan S. Graf, Swanson, Thomas & Coon, Portland, OR, for Plaintiff.

Chrys Anne Martin, Lori R. Metz, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for Defendants.

OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff Sandra Palmer brings this action under Section 502(a)(1)(B) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover long-term disability benefits pursuant to an insurance policy issued by defendant Standard Insurance Company ("Standard") as part of an employee welfare benefit plan sponsored by her employer, defendant University Medical Group ("UMG"). Plaintiff also asks this court to impose penalties of one hundred dollars per day, pursuant to 29 U.S.C. § 1132(c)(1), against Standard for withholding certain documents that plaintiff had requested during the time that her claim was being reviewed by Standard.

This court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e) and (f) and 28 U.S.C. § 1331. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with F.R.C.P. 73 and 28 U.S.C. § 636(c). Pending before the court are (1) the parties' cross-motions for summary judgment, (2) plaintiff's request for reconsideration of this court's earlier rulings regarding the scope of discovery and the standard of review, and (3) plaintiff's motion to supplement the record.

### FACTS

The administrative record is comparatively sparse. The plaintiff is 59 years of age. She did not complete high school, but later obtained a GED. She was employed as a medical claims analyst for defendant UMG since 1988. Before that she held other clerical positions, and also had worked for many years as a waitress, cook, and bartender. She has a long history of back and neck pain dating back to at least 1982, and perhaps even earlier, though it is not entirely clear whether her present complaints are related to the symptoms for which she previously had been treated.[1] In October 1995, plaintiff informed her employer that she was unable to continue working and applied for long-term disability benefits. Her treating physician, Dr. Kelly Krohn, concluded that "at this time, she is unable to continue to perform the duties of a Medical Claims Processor." (R 64–65).[2] Defendant Standard, relying primarily upon the recommendation of its own non-examining physician, denied plaintiff's application for disability benefits. Plaintiff has exhausted all administrative appeals.

The medical history in the record dates back to October 15, 1982, when plaintiff was examined by Dr. David Noall of the Oregon Orthopedic Clinic. His chart notes reflect that plaintiff "has had trouble off and on for quite some time" with her back and neck. (R 118). Just prior to seeing Dr. Noall, plaintiff had missed five days of work due to her back and neck pain. At the time, plaintiff was employed as a waitress, cook, and bartender. The referring physician, Dr. Yand, instructed plaintiff not to return to work until she could be evaluated by Dr. Noall. (*Id*). The latter concluded that her back problems were incompatible with her present employment and recommended an occupational change. In the interim, plaintiff was instructed to stay off work for at least four weeks, and to commence an exercise program for her back. (*Id*).

After further testing, Dr. Noall diagnosed plaintiff's condition as a "lumbosacral strain, chronic, with underlying degenerative disc disease, L5–S1, chronic cervical strain with underlying degenerative disc disease, C5–6." (R 116). In late 1982 and early 1983, plaintiff received additional treatment (such as physical therapy) and vocational counseling directed at retraining her for clerical work. (*Id*). The record is not entirely clear, but it appears that plaintiff remained off work during this period of time. (R 115–16). During 1983 and 1984, plaintiff continued to periodically complain of back and neck pain, and sometimes leg pain as well.

In late 1984, plaintiff apparently found employment in a clerical occupation; the record reflects a telephone call to her doctor report-

---

**1.** In her application for benefits, plaintiff described her primary symptom as "chronic thoracic back pain" but said she "never had thoracic pain until 1 yr. ago." (R 126).

**2.** Unless otherwise noted, citations to the record utilize the page numbers in Exhibit B to the Affidavit of Helen S. Bibb.

ing that her back was bothering her at work while typing. (R 114). Around that same time period, Dr. Noall reaffirmed his original diagnosis, and added that her "impairment is mild." (Id).

During 1985, plaintiff continued to perform clerical work—apparently as a data entry clerk—and continued to complain of back pain. (R 113). Plaintiff also desired to resume treatment for depression. (Id). An x-ray of the lumbar spine disclosed "considerable disc space narrowing at L5–S1 with marked narrowing and spurring in this area" along with "mild narrowing at L4–5." However, there had been no change since the films in 1982. (Id).

In late July 1985, plaintiff again missed work due to back and leg pain. (R 112). She was instructed to take a week off, after which she was able to return. (Id). Dr. Noall also recorded that plaintiff has difficulty tolerating anti-inflammatory drugs because of resultant gastrointestinal distress. (Id). In December 1985, plaintiff was seen again, this time for swelling in her hands, but the examination disclosed no apparent difficulties. (Id). Over the next few months, plaintiff continued to report problems with swelling in her hands; eventually, she was referred to a specialist (Dr. Bogardus) who prescribed a diuretic that soon resolved the problem. (R 111).

In April 1986, plaintiff called Dr. Noall to report that she was flat in bed, unable to go to work, and in a lot of pain (which was concentrated in her lower back with radiation to her legs). (R 100–110). She was given prescriptions for codeine and naprosyn, and instructed to remain off work. (Id). Plaintiff had difficulty tolerating the naprosyn, but eventually responded to this treatment, and returned to work after having been away for three weeks. According to Dr. Noall's chart notes, the episode did "not appear to be anything more than a transient exacerbation of symptoms." (R 110).

In April 1987, plaintiff was again seen by Dr. Noall, this time for persistent pain in her neck and shoulder, as well as headaches. (R 109). She was then employed as a receptionist. After taking new x-rays and conducting other tests, Dr. Noall diagnosed her problem as "degenerative intervertebral disc disease with acute exacerbation" and prescribed another course of naprosyn. (Id). Plaintiff again had difficulty tolerating the naprosyn, and reported that her "neck [was] really hurting." (R 108). Dr. Noall gave her a prescription for Feldene. (Id).

In April 1988, plaintiff again came to see Dr. Noall complaining of pain in her back. He issued another prescription for Feldene. (Id). In January 1990, plaintiff was seen by Dr. Noall regarding a lump on her ankle and swelling of her leg. This was determined not to be serious. (R 107–108). In June 1990, plaintiff called Dr. Noall again complaining of back pain, and was prescribed Feldene and codeine. (R 107). In May 1991, plaintiff called Dr. Noall wanting a prescription to purchase equipment needed to perform exercises for her back, but was told that was not permitted. (Id).

In February 1992, plaintiff again called Dr. Noall complaining of lower back pain of one month's duration and was given Feldene. (Id). By now, the plaintiff was employed by defendant UMG. In April 1992, plaintiff was examined by Dr. Noall. Since the Feldene did not appear to be effective this time, Dr. Noall prescribed Flexeril, and also recommended back exercises. (R 106–07).

In July 1993, plaintiff called to report "back pain which covers the area from her waist to the neck." (R 106). Dr. Noall gave her another prescription for Flexeril. A few days later, plaintiff came in for another examination. She reported that the back pain had been increasing during the past four months, while the neck pain appeared to be related to a recent fall. (Id). She had missed one day of work. Testing disclosed that her range of motion was close to normal, as were reflexes and motor strength. (R 105–06). Dr. Noall diagnosed her condition as "osteoarthritis of cervical spine and thoracic area with symptom flare up due to recent fall," but felt that her overall condition was "not deteriorating" and recent x-rays disclosed no significant changes when compared to her 1987 films. (R 105). He prescribed more Flexeril, though plaintiff reported that it made her drowsy. (Id).

In December 1994, plaintiff reported that she had an adverse reaction to the Feldene,

which resulted in an asthma attack. Dr. Noall suggested that her primary care doctor prescribe a different medication. (R 103). Later that month, plaintiff was again seen by Dr. Noall for "follow-up of her chronic thoracolumbar back pain." (R 105). She reported that the Feldene was causing side affects, and ibuprofren was ineffective. (Id). She described "increasing generalized soreness in her back," while her upper back was "like on fire." (R 104). She also reported pain in her lower back and right hip, which she rated as a 10 on a 0–10 scale, was taking codeine to relieve the pain, and had been using a crutch for support. (Id).

Plaintiff reported that she had left work the previous Friday due to upper back pain and had not returned since (this being the following Wednesday), but her condition had not improved. (Id). Plaintiff told her doctor that she recently had experienced a three-to four fold increase in the volume of paperwork she was required to process at her job, and her work had become very stressful. (Id). An examination revealed "diffuse discomfort and tenderness over the entire thoracolumbar area aggravated by lying prone." (Id). Dr. Noall diagnosed "chronic thoracolumbar back strain," which he believed "represents a flaring of her symptoms and not a worsening of her underlying condition" which in his view "remains medically stationary." (Id). Dr. Noall attributed the episode, at least in part, to "stress at work" and predicted that it would "settle back down to a more reasonable level." (Id). He prescribed more Flexeril, and excused her from work until the following Tuesday. (Id).

In April 1995, plaintiff called Dr. Noall to report that her upper back was still causing problems, and inquired whether physical therapy might help. Dr. Noall did not think so. (R 103). On May 1, 1995, plaintiff called Dr. Noall; the message taken by the receptionist reads, "Re: back ache pain continusly! (sic)" She left a similar message the next day. (R 103). On May 31, 1995, plaintiff was examined by Dr. Noall. She reported that the pain had become worse the past eight months, and was centered in her mid-to-lower thoracic area. (R 102). She rated the pain as a "9" on a scale of 0–10, and reported that she was "[a]lmost in tears when I leave work." (Id). Plaintiff reported

that her lower back and neck were not painful, but she did have occasional pain in her right leg, and was unable to vacuum. (Id). Her primary care physician had retired and she had not found a replacement. She had been taking Flexiril intermittently and codeine occasionally. (Id).

Dr. Noall again diagnosed chronic thoracolumbar back pain. He recommended a bone scan "to look for an osteoarthritic pattern and to rule out other causes of back pain such as tumor." (Id). With regard to her work status, Dr. Noall wrote:

WORK STATUS:

Medically Stationary: Probably yes.

Work Release: May need to limit total hours of sitting time.

Estimated Length of Treatment: To be determined depending upon the bone scan results.

Anticipated Permanent Impairment: Probably no additional.

(Id). Plaintiff was then referred to Dr. Dwight Freeman for what is described as a "second opinion." (R 90). According to Dr. Freeman's report, dated July 20, 1995, plaintiff represented that the present set of symptoms began around September 1994, about two months after she had undergone a marked increase in her work volume:

Each Monday she would have to hand-sort 7,000 to 12,000 paper claims. Initially she had increased pain during the week and could recover over the weekend. She began leaving early in the afternoons without pay to avoid the discomfort but the symptoms continued to worsen. She was given an ergonomic chair .... More recently her pain has not resolved over the week despite being at baseline activity levels. She has seen Dr. David Noall who has managed orthopedic problems for her in the past. She was treated with Flexeril (which she stated helps but knocks her out), and also with Tylenol # 3 which makes her sick. She takes over-the-counter Advil and extra-strength Tylenol which helps a little. She states the employer offered to pay partial long-term disability benefits if she could work part-time. Dr. Noall advised getting a bone scan before approving this.

\*    \*    \*    \*    \*    \*

Currently, she feels she [is at][3] an impasse. She now has greatly decreased activity levels. She states she is tired and sleepy all the time. She feels hopeless in that she will never find out what is wrong with her. She states she has become withdrawn from social life and states she is almost reclusive on weekends. She has had others do shopping at the grocery for her. She lays on the couch most of the weekend, only getting up periodically to try to do some light housework.

(R 90). Plaintiff estimated that she could not sit for more than 20–30 minutes, but did not recall any limitation in standing or walking. (R 91). Plaintiff reported that she formerly went to garage and estate sales and movies, and participated in reading and crafts, but was no longer able to do these things. (*Id*). Dr. Freeman reviewed the x-ray films taken several months earlier.

There was slight scoliosis with the upper thoracic curve to the left and a lower thoracic curve to the right, although rather mild. There is anterior lipping of the margins of the lower thoracic vertebral bodies. A cervical spine series showed narrowing anterior lipping at C5–6 and C6–7. There is a slight reversal of the normal lordotic curve. There is also lipping in the C5–6 and C6–7 vertebral foramina. There was several lumbar spine series but a three-view lumbosacral spine series done on 29 march 1995 by Dr. Miller showed six non-rib bearing lumbar vertebra. The L6–S1 intervertebral space appeared essentially fused with some coalescing anterior osteophytes in a markedly narrowed disk space.

(R 93). Dr. Freeman also detailed the results of various clinical tests aimed at determining any limitations upon plaintiff's range of motion and reflex responses. (R 92–93). Dr. Freeman's diagnoses included: (1) Strain, chronic, thoracic spine; (2) Thoracic spine pain without evidence of root problems; (3) Poor body mechanics; (4) Deconditioned abdominal musculature; (5) Status post strain, cervical spine, remote; (6) Chronic cervical spine pain with right upper extremity pain secondary to diagnosis # 5; (7) Status post strain lumbosacral spine, remote; (8) Chronic low back pain and left lower extremity pain secondary to diagnosis # 7. (R 93).

Dr. Freeman recommended a conservative course of therapy for the present: (1) Obtain a radioactive bone scan with main area of interest being the axial skeleton; (2) If negative or significant[4] bony pathology, then start physical therapy to include pool treatments at neck-shoulder depth with active stretching and water aerobics with instruction in exercise to the thoracic spine; (3) Muscle relaxation instructions per Dr. Duane Kolilis; (4) Continue trials of anti-inflammatories; (5) Continue trials of muscle relaxants; (6) Continue use of an antidepressant at bedtime; (7) Ultram, 50 mg. tabs 1 or 2 every 4–6 hours p.r.n. pain. (R 94).

On July 19, 1995, plaintiff completed a questionnaire, apparently for Dr. Freeman. (R 95–99). She described her problem as "upper back pain began approx. 10 mnths. ago. Almost constant. Brief relief daily if I use enough medication." (R 95). She inquired whether the problem might be related to the problems she had since 1982. (*Id*). Plaintiff reported that bed rest helped stop the pain, though it sometimes woke her up during the night. (R 96). Her "significant other" had died 1–1/2 years earlier, and her children were all grown and living on their own. (R 99). She reported having abandoned most recreational pursuits, because "[I] don't feel well because of constant pain and medications ... No longer feel like doing anything and have gained 20 lbs, mostly in body/trunk." (R 99).

On August 1, 1995, the bone scan was performed. It revealed "[m]oderate symmetrically increased radioactivity at the posterior articular processes of the fifth lumbar vertebra consistent with spondylolysis or spondylolisthesis," and "[f]aintly increased radioactivity at the left posterior articular processes of two adjacent mid-cervical vertebra consistent with degenerative disease."

---

**3.** The original document says "she has had an impasse," but that appears to be a clerical error in transcribing the dictation.

**4.** This may be a typographical error. The word "insignificant" seems more appropriate in view of the context.

(R 77). "No other vertebral abnormalities are noted in the thoracal lumbar spine." (*Id*).

On August 30, 1995, plaintiff saw Dr. Kelly Krohn, of the Arthritis & Rheumatic Diseases section of Oregon Health Sciences University. His chart notes describe her as "tearful." (R 66). His initial diagnostic impressions were "chronic mid-low back pain, ? myofacial pain, sleep disturbance, [and] mild depression." (R 67). His chart notes also indicate that he was considering whether to refer plaintiff to a pain clinic, and also "? reduce work schedule." (*Id*).

On September 6, 1995, at Dr. Krohn's request, plaintiff was administered an MRI of the thoracic and lumbar spine at OHSU. The reason given for the examination was that plaintiff had "severe lower thoracic pain" and the examination was needed "to evaluate this more fully." (R 70). This examination of the thoracic spine detected a "fairly prominent scoliosis of the midthoracic spine," but "no evidence of disc disease or herniation involving the thoracic spine. Posterior to the T9–T10 level there is a focal abnormality in the left posterior elements which mildly impinges on the thecal sac at this level. There is no evidence of cord compression. It is difficult to assess whether the neural foramina are involved [or] not." (*Id*). The examination of the lumbar spine revealed "mild narrowing of the L4–L5 and L5–S1 intervertebral disc spaces with preservation of the remainder of the intervertebral disc spaces. There is loss of the normal high signal in the intervertebral disc spaces on the T2 weighted images at L4–L5 and L5–S1 consistent with disc dessication. No abnormal disc herniation or thecal sac compromise is noted within the lumber spine. There is no evidence of lumbar spinal cord or nerve root compression." (*Id*). The overall findings included: (1) Thoracic spine scoliosis; (2) Left T9–T10 ligamentum flavum hypertrophy and facet degenerative disease. These mildly imprint the thecal sac at this level without evidence of cord compression; and (3) Dessication of the intervertebral discs at L4–L5 and L5–S1 without evidence of lumbar cord compression. (R 70–71).

On September 19, 1995, Dr. Krohn wrote a "To Whom it May Concern" letter:

Sandra Palmer has been followed by me at the Oregon Health Sciences University (OHSU) since August 30, 1995. She has chronic mid to low back pain which has been very difficult to manage. She has recently undergone a thorough evaluation and is getting treatment for her pain which has been somewhat helpful. The primary purpose of this letter is to inform you that intermittently Sandra may need to leave work early or potentially even miss a day of work due to her severe pain. Sandra has expressed that she wants to continue to work full time and will work with her supervisors to accommodate her schedule.

(R 78). On October 3, 1995, plaintiff called and left a message for Dr. Krohn regarding "long term disability." On October 4, 1995, plaintiff wrote a letter to an unidentified person, probably Dr. Krohn,[5] which read:

It is after much thought and consideration that I am sending these papers for you to fill out. No matter how I have explored this situation the bottom line is, I can no longer stand the pain from sitting, trying to stand to do my work and the exhausted state that I leave work in everyday. All of my energy has been concentrated on my job. I need to take care of myself and do the things that might help me live a better life. I look forward to seeing you in a couple months.

(R 69).

The record is not entirely clear, but plaintiff probably continued to work for several more weeks while the application for disability benefits was being processed; the "employer's statement" in the record cites October 27, 1995, as the date that plaintiff stopped working. (R 131). In her note to Dr. Krohn, she asked that he return the disability forms "as soon as possible as they will not hire a replacement until they have the papers." (R 69). It thus appears that plaintiff decided to remain at her post for a few weeks longer until her employer could find someone to take her place. It is unclear

5. A copy of the letter was found in Dr. Krohn's file, and he subsequently completed and returned the forms pertaining to plaintiff's disability application.

whether she missed any days of work or left early during October 1995.

On or about October 16, 1995, Dr. Krohn completed the "Long Term Disability Claim Attending Physician's Statement." (R 129). He listed "10/16/95" as the "date you recommended patient should stop working." (R 130). The reason for that recommendation was that "she is unable to tolerate the daily pain." (*Id*). The expected duration of her disability was "unknown" because of the "unpredictable nature of back pain." (*Id*). Dr. Krohn planned to follow-up in "2–3 months." (*Id*). In the interim, his planned treatment included physical therapy and various prescription medications. (*Id*). A note in the file indicates that Dr. Krohn also utilized a "trigger point injection" but it was not effective in relieving her pain. (R 81).

At Standard's request, Dr. Krohn examined plaintiff again on January 3, 1996. His report to Standard, dated January 4, 1996, reads in relevant part:

> Sandra suffers from chronic mid to low back pain. Her pain is mechanical in nature. It is located in her lower thoracic upper lumbar region. She has had an extensive evaluation including bone scan, which was unremarkable in August of 1995. I originally began seeing her on August 30, 1995. It was my impression at that time that she had localized mechanical pain but her pain was of a significant intensity that I felt it was reasonable to go forward with an MRI to make sure she did not have an alternative mechanical cause for her pain.
>
> An MRI was obtained on September 6, 1995, and I have reviewed it with the OHSU radiologist. Other than some thoracic spine scoliosis and some mild degenerative changes in her facet joints, the MRI was basically unremarkable. She never had any neurological symptoms to suggest a compressive neuropathy and certainly the MRI was reasonable in this regard.
>
> On her clinical examination, she continues to have very localized pain to palpation in the paravertebral region as well as in the posterior prominence of the lower thoracic vertebrae. Her range-of-motion is somewhat limited. She is able to flex and extend fully but has difficulty with lateral bending and lateral rotation.
>
> In discussing her routine pain levels, she notes that she has significant pain with sitting any time period greater than approximately 15 minutes. She notes that she has difficulty standing more than approximately 10 minutes. Her most intense pain comes with any bending or twisting action and she notes that she has difficulty with lifting even simple objects like dishes out of the dishwasher.
>
> Although I am uncertain of the exact etiology of her back pain, I feel that it is mechanical in nature and we've done our best to rule out any serious pathologies such as a malignancy or a herniated disc. I feel that her pain level is intense and that her verbalization of her ability to do activities is consistent with her clinical exam. It is my belief that, at this time, she is unable to continue to perform the duties of a Medical Claims Processor. Her work duties involve a considerable amount of time spent in a sitting position and oftentimes at a computer which she found quite painful.

(R 64–65). On January 12, 1996, Standard claim analyst Micah Rubenstein sent a note to Dr. Bradley Fancher, who is employed by Standard as a medical consultant but does not specialize in diagnosing or treating back injuries. Dr. Fancher was asked to address two questions: (1) Do the objective findings show the claimant can't work in a sedentary occupation—sorting, mailing claim forms? (2) Do her limitations and restrictions, provided positional changes, preclude her from doing her job? (R 51) (abbreviations transcribed). On February 1, 1996, Dr. Fancher responded:

> I have reviewed all of the available medical records on this claimant. The claimant has chronic thoracic and lumbar back pain which appears to be due to a myofascial pain syndrome. The claimant has minor degenerative changes in her spine which probably are not related to her back discomfort. She has received reasonable medical care. There is no evidence of a radicular syndrome or nerve impingement syndrome. It is my general feeling that

patients with chronic mechanical back pain due primarily to muscular factors should be able to perform sedentary work on a full-time basis. The claimant's symptomatology is out of proportion to what her pathology seems to be. I'm uncertain if there are complicating psychosocial issues at play here. An orthopedic IME could be considered, though I am uncertain if you wish to pursue this. The objective evidence that Standard has to review would suggest that the claimant is capable of performing sedentary work.

(R 50). On February 6, 1996, Standard's claim analyst Micah Rubenstein recommended that plaintiff's claim be denied:

Based on the fact that the claimant's occupation is sedentary and there is no objective information to support the pain level the claimant is claiming to experience, I recommend denial of this claim.

(R 138). A second Standard employee, whose signature is illegible, concurred:

Agree, based upon medical data & Dr. Fancher's 2/1/96 memo. I see no clinical findings to support severe impairment, especially after 60 days.

(*Id*). On February 14, 1996, Standard issued its decision:

We have reviewed the medical information in your file. Current information from Dr. Krohn indicates he believes you are experiencing some pain. Dr. Krohn also notes that all medical examinations related to your low to mid back pain have been unremarkable in determining the cause of your pain. This includes the MRI obtained September 6, 1995.

Our medical staff has reviewed the information contained in your file. Based upon this review, we have determined that the subjective complaints far outweigh the clinical findings.

Your medical condition does not pose significant limitations to prevent you from performing your duties as a Claims Processor, considered a sedentary occupation. The U.S. Department of Labor defines a sedentary job as occasionally exerting up to 10 pounds of force and/or a negligible amount of force frequently or constantly to lift, carry, push/pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.

(R 46). Rubenstein's notes reflect that on February 16, 1996, plaintiff called to protest the decision and Rubenstein "told her that the complaints exceed the [unintelligible] clinical findings and that the clinical findings indicate that she should be able to do a sedentary job, which her job is." (R 44). Plaintiff timely filed an appeal of that decision.

Plaintiff then made an appointment to see a neurologist. On March 27, 1996, plaintiff was examined by Dr. Joseph Quinn of the General Neurology Clinic at OHSU. (R 30). His notes show that plaintiff was "a bit depressed and intermittently tearful," but "entirely cooperative with the examination." (R 31). Dr. Quinn found "no evidence of any neurologic defect." Rather, the history and examination were more indicative of "musculoskeletal pain than of neuropathic pain, given the aggravation with activity and positioning." (R 31–32). Dr. Quinn did "not believe further neurologic diagnostic evaluation would be helpful." (R 32). He "agree[d] with Dr. Krohn's empiric pain management approach." (*Id*).

On May 13, 1996, Standard informed plaintiff that "based upon a thorough review of Ms. Palmer's claim file, we find insufficient evidence to support that Ms. Palmer has a medical condition which would prevent her from performing the material duties of a Medical Claims Analyst. Therefore, we find the original decision to deny Ms. Palmer's claim[] to be correct." (R 23). However, Standard was also "referring Ms. Palmer's file to our Quality Assurance Unit for an independent review." (*Id*). This "independent review" was conducted by another Standard employee, Helen Bibb. The latter wrote a terse memorandum which can be summarized in two sentences: "No reasonable explanation for etiology of her stated pain level. Reasonably should be able to perform sedentary work with limitations and restrictions noted." (R 21) (abbreviations transcribed).

On May 31, 1996, Standard issued its final decision. Standard reaffirmed its previous decisions, on grounds that "Ms. Palmer's reported symptomology exceeded her docu-

mented pathology. The objective medical evidence provided did not support that Ms. Palmer was not able to perform sedentary work." Plaintiff timely sought judicial review of Standard's decision.

On June 4, 1996—prior to receiving Standard's final decision—plaintiff's counsel made a written request to Standard "[p]ursuant to ERISA law" for "copies of all plan documents and copies of all documents, notes and medical records you have used in your decision-making process regarding my client." On June 11, 1996, Standard purported to furnish plaintiff's counsel with the documents that had been requested. However, when Standard filed the administrative record with this court, plaintiff discovered that the record contained a number of documents that were not included in the materials furnished to plaintiff on June 11. For purposes of this motion, Standard admits that plaintiff did not receive those additional documents but contends they were outside the scope of the documents that were requested.

*DISCUSSION*

1. ***Does the Plan language confer discretion?***

■ In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court decided that the standard of review in ERISA cases is *de novo;* to read ERISA as requiring only abuse of discretion review would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* 489 U.S. at 114. The Court then noted a single exception to that rule: if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. The Court presumably intended for this to be a narrow exception, or else the exception would swallow the very rule that the Court had just announced.[6] The long-term disability plan ("Plan") at issue here provides, in relevant part, that:

1. Until LTD BENEFITS have been paid for 24 months, you are only required

to be DISABLED from your own occupation.

You are DISABLED from your own occupation if, as a result of SICKNESS, ACCIDENTAL BODILY INJURY or PREGNANCY, you are EITHER:

a. Unable to perform with reasonable continuity the material duties of your own occupation; OR

b. Unable to earn more than 80% of your INDEXED PREDISABILITY EARNINGS while working in your own occupation.

\* \* \* \* \* \*

2. After LTD BENEFITS have been paid for 24 months, you must be DISABLED from all occupations.

You are DISABLED from all occupations if, as a result of SICKNESS, ACCIDENTAL BODILY INJURY or PREGNANCY, you are EITHER:

a. Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience; OR

b. Unable to earn more than 80% of your INDEXED PREDISABILITY EARNINGS while working in your own or any other occupation.

\* \* \* \* \* \*

Subject to all of the terms of the GROUP POLICY, STANDARD will pay the LTD BENEFIT described in Part 8 upon receipt of satisfactory written proof that you have become DISABLED while insured under the GROUP POLICY.

\* \* \* \* \* \*

Under the plain language of the Plan, the decision to pay benefits is not purely "discretionary." Standard *must* pay the specified benefits to any person covered by the Plan who submits satisfactory proof of disability as defined in the Plan. Standard nonetheless contends that its decision to deny benefits may be reviewed only for abuse of discretion because the Plan makes payment of disability benefits contingent upon "receipt of satisfac-

---

**6.** Although the Court used the term "eligibility for benefits," it is not readily apparent that the Court had insurance companies in mind, or an insurance company's decision to deny an insurance claim. Pension benefits, not insurance benefits, were the central issue in *Firestone.*

tory written proof that you have become DISABLED."

If I were writing upon a clean slate, I would seriously question that argument. The requirement that an insured furnish the insurer with "satisfactory" proof of loss is found in most insurance policies, yet an insurance company's decision to deny a claim has historically been reviewed *de novo*. Obviously, there is some element of judgment involved in that a Standard employee must determine whether satisfactory proof of disability has been furnished. However, the exercise of some modicum of judgment— which is implicated in even routine tasks such as driving a car—is usually distinguished from those decisions that involve policy-making or the weighing of various interests and choices. This distinction has long been recognized in the extensive body of caselaw that has evolved concerning immunity given to many government officials for "discretionary" functions.[7] The instant case does not involve any "policy decisions" on the part of the fiduciary. This is not a case that requires the fiduciary to reconcile a conflict between the rights and needs of several subclasses of beneficiaries, or to exercise discretion in the interpretation of the Plan language, or to establish priorities and objectives. On the contrary, defendants have expressly disclaimed that there is any issue of Plan interpretation here. Defendants' Response at 2 ("this case does not involve a plan interpretation issue, but involves a fact determination as to disability.") The policy decisions have all been made. What remains is the task of reviewing the file and determining whether plaintiff has established that she is disabled as defined in the Plan. I question whether that is what the *Firestone* court had in mind when it carved out an exception to *de novo* review in those instances where the Plan confers discretion upon the fiduciary. To interpret *Firestone* and the policy language in that fashion appears to "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.* at 114.

However, I am not writing upon a clean slate. The Ninth Circuit (along with most of the other circuits) has broadly applied the abuse of discretion standard to encompass Plan language that requires "satisfactory" proof of loss. *See, e.g., Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir.1996) (summarizing Circuit precedent). In *Snow*, this Circuit specifically decided that a Plan

---

7. As the Oregon Supreme Court has observed:

> Many officers or employees carrying out the functions entrusted to them by others must frequently assess facts and choose how to act or not to act upon them. But not every exercise of judgment and choice is the exercise of discretion. It depends on the kind of judgments for which responsibility has been delegated to the particular officer. Discretion ... involves room for policy judgment, or the responsibility for deciding the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. It involves the delegated responsibility for assessment and ranking of the policy objectives explicit or implicit in the statute and for the judgment that one or more of these objectives will be served by a given action.

*McBride v. Magnuson*, 282 Or. 433, 436–37, 578 P.2d 1259 (1978) (internal citations and quotation marks omitted). Cases construing the Federal Tort Claims Act likewise distinguish between those acts that involve policy decisions, versus those which concern the implementation of a policy or standard that has previously been determined, or which do not involve the sort of discretionary decisions that were intended to be shielded. *Cf. Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1503–05 (9th Cir.1989) ("key inquiry is not whether the government employee has a choice, but whether that choice is a policy judgment"; decision whether to use dynamite versus another method of excavation might represent a policy choice, but the question of how much dynamite to use was a matter of applying industry standards, not public policy considerations); *In re The Glacier Bay*, 71 F.3d 1447 (9th Cir.1995); *Valdez v. United States*, 56 F.3d 1177 (9th Cir.1995); *Greenhalgh v. United States*, CV No. 90–0448–EJL (D. Idaho 1994) (although considerable skill and judgment are involved in flying military aircraft at supersonic speeds, government is not immune from liability for injuries caused by aircraft flying at lower altitude than authorized; policy decision was made by Air Force when it established minimum altitude requirement to prevent injuries to civilians caused by sonic booms), *aff'd*, 82 F.3d 422 (9th Cir.1996); *Keir v. United States*, 853 F.2d 398 (6th Cir.1988) (although practice of medicine involves considerable skill and judgment, discretionary function immunity does not preclude liability for malpractice where applicable standards and procedures had been established and physician's job was merely to implement those policies); *Davis v. Knud–Hansen Memorial Hospital*, 635 F.2d 179, 186–87 (3rd Cir.1980) (same).

which "provides that there will be no benefit payment unless Standard is presented with what it considers to be satisfactory written proof of the claimed loss" falls within the "discretionary" exception established by *Firestone. Id.*, 87 F.3d at 330. That is indistinguishable from the language in the instant Plan. Accordingly, I conclude that this Plan contains the requisite "discretionary" language by which the decision to deny plaintiff's claim for disability benefits must be reviewed for abuse of discretion.

## 2. *Conflict of Interest:*

■ Having recognized that insurance companies have discretion to decide whether to pay benefits, the Circuit has sought to avoid unfair results by focusing upon whether the decision has a conflict of interest and if so, whether the decision maker was influenced by that conflict. That is a valid concern. *Firestone*, 489 U.S. at 115. However, various Ninth Circuit panels have charted different paths concerning this issue, as was discussed at length in my prior opinion. *Palmer v. University Medical Group*, 973 F.Supp. 1179 (D.Or.1997). Some panels assumed that there were certain situations in which the decisionmaker was inherently conflicted—*e.g.*, when the person deciding whether to award benefits is the insurance company that must pay any benefits that are awarded—and applied a somewhat heightened level of review in such cases. Other panels adopted a burden shifting methodology which requires the claimant to present proof that the decision actually was tainted by the conflict, at which time the burden would shift to the fiduciary to establish that the decision was free of taint. If the fiduciary met that burden, or if the claimant failed to demonstrate that the decision actually was tainted by the conflict, then review would be under the abuse of discretion standard. If the fiduciary failed to refute the evidence of taint, the decision was subject to *de novo* review.

In my prior opinion, I concluded that the instant case involves an inherent conflict of interest. Instead of requiring plaintiff to furnish proof that the decision was tainted, which would necessitate extensive discovery and perhaps a trial on collateral issues, I elected to follow the sliding scale approach

which I believed to be the law of this circuit. I did not require Standard to submit to further discovery aimed at uncovering evidence that Standard's decision to deny benefits was tainted by a conflict of interest. *Id.*

Plaintiff now has requested reconsideration of that decision in light of the Ninth Circuit's recent decision in *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794 (9th Cir.1997). The opinion in *Lang* does not comment on the potential conflict between the *Atwood–Snow* line of cases and other decisions by this Circuit. Rather, the panel simply followed what it believed was the controlling Ninth Circuit authority.

■ Under Ninth Circuit rules, one Ninth Circuit panel cannot overrule another; only an *en banc* court can overrule the prior panel decision, at least in the absence of a change in controlling authority. *Fluck v. Blevins*, 969 F.Supp. 1231, 1236–37 (D.Or.1997). In the event of a conflict between two Ninth Circuit panel decisions, the trial court ordinarily follows the older case. *Id.* For the reasons set forth in my prior opinion, I am unable to reconcile the *Atwood–Snow–Lang* line of cases with a number of earlier Ninth Circuit decisions. Consequently, until the Circuit resolves this apparent split in authority I will continue to follow those earlier Ninth Circuit decisions which I perceive to be the controlling authority in this circuit.

I therefore adhere to my earlier decision to deny plaintiff's motion to compel, and to limit discovery, for the reasons set forth in my opinion of July 21, 1997. *Palmer*, 973 F.Supp. 1179. I also reaffirm the views expressed in the earlier opinion regarding the effect that the conflict of interest has upon the standard of review in this case. *Id.* I will review the plan administrator's decision for abuse of discretion, but that review will be a little more searching and I will be less deferential in my review of the administrator's decision. However, in order to avoid the expense and delay which might result from a remand if the Circuit later decides that I should have employed a different methodology, in this opinion I will separately evaluate this case applying both the standard of review that I have described and also the methodology described in *Lang*.

### 3. The Merits—Part One:

■ Under the terms of the long-term disability policy at issue here, during the first 24 months the plaintiff was considered to be disabled if she either was "unable to perform with reasonable continuity the material duties of [her] own occupation" or was "[u]nable to earn more than 80%" of her indexed predisability earnings. Accordingly, if plaintiff's back condition necessitated any significant reduction in her work schedule—even a reduction to 30 hours a week instead of 40—she would be deemed "disabled" and entitled to benefits under the terms of this Plan.

Plaintiff's physician certified, in writing, that plaintiff was presently disabled and unable to perform her regular duties as a result of pain from a chronic back condition. Standard's non-examining physician disagreed, and Standard therefore denied her claim for benefits. I conclude that Standard made a number of errors in the course of evaluating this claim.

Throughout the claims review process, Standard's overriding concern was "objective medical evidence." While that certainly is a relevant consideration, Standard erred in this instance by elevating it to an absolute prerequisite. Not all medical conditions are readily susceptible to verification by x-rays or other laboratory tests. Some complaints—such as pain and fatigue—are difficult to objectively measure, and there is considerable variation among individuals. *See Bunnell v. Sullivan,* 947 F.2d 341, 345–47 (9th Cir.1991) (en banc). There also is much that we do not know about the human body. Merely because we cannot see pain or fatigue on an x-ray, or measure it in a laboratory, does not mean that it is not real. *Cf. Bunnell,* 947 F.2d at 347 ("We cannot conclude that Congress intended to require objective medical evidence to fully corroborate the severity of pain while aware of the inability of medical science to provide such evidence.") These symptoms may also persist notwithstanding our uncertainty as to the precise etiology.

In such cases, diagnostic procedures such as x-rays and lab tests are only one component of the total picture. Other considerations include (but are not limited to) the professional opinion of the treating and examining physicians; the claimant's medical history; the credibility of the claimant; the congruity (or lack thereof) between the reported symptoms and the person's activities and claimed limitations; the response (or lack thereof) to treatment and the claimant's cooperation in such treatment; whether the reported symptoms are anatomically implausible; and whether there is evidence of an underlying impairment that potentially could produce the sort of pain or other symptoms alleged.

This Circuit has repeatedly confronted this issue in the context of social security disability claims, and has developed an analytical framework to assist in the assessment of disability claims predicated upon pain. The Ninth Circuit recently summarized our caselaw in that regard:

> If a claimant produces evidence that he suffers from an ailment that could cause pain, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." .... The ALJ rejected Light's pain testimony because he "found [Light's] testimony not credible." In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. An ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony. But, because a claimant need not present clinical or diagnostic evidence to support the severity of his pain, *Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir.1990) (stating that "it is the very nature of excess pain to be out of proportion to the medical evidence"), a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain. *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995); *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986) (" 'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An ALJ may not discredit a claimant's subjective testimony on that basis. To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony.

*Light v. Social Security Administration,* 119 F.3d 789, 792 (9th Cir.1997) (internal citations omitted). This Circuit also has articulated standards for evaluating and ranking the testimony of various types of physicians:

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.[8] We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclusions. Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.

The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.

*Lester v. Chater,* 81 F.3d 821, 830–31 (9th Cir.1995) (internal citations omitted).

Defendants cite *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279 (9th Cir.1990), for the proposition that our social security caselaw is inapposite in an ERISA case. That misses the mark. The issue in *Madden*—and in several other opinions cited by defendants—was the significance that attaches to a determination that the claimant was disabled for purposes of social security. The *Madden* court concluded that the Secretary's decision is not binding upon the ERISA administrator because, *inter alia,* the ERISA Plan may have a different definition of disability and because different evidence may have been presented in the two proceedings. *Id.* at 1287.

By contrast, the issue presented here is not whether to give preclusive effect to the Secretary's decision in a specific case but whether to borrow some of the analytical tools that have been developed by the federal courts in the course of reviewing thousands of social security disability determinations. While there are differences between an ERISA disability claim and a social security disability claim, many of the analytical tools that were developed in our social security jurisprudence—such as how to evaluate claims of "excess pain" or the degree of deference to be given to the conclusions of a treating physician—did not flow entirely from the Social Security Act itself.[9] They

---

**8.** Less deference may be required, however, when the treating physician's opinion is largely conclusory or based entirely upon the claimant's subjective complaints which are not buttressed by clinical findings. *See Bunnell v. Sullivan,* 912 F.2d 1149, 1153 (9th Cir.1990), *vacated in part on other grounds,* 947 F.2d 341, 348 (9th Cir. 1991); *Fair v. Bowen,* 885 F.2d 597, 605 (9th

Cir.1989); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989).

**9.** Indeed, some members of the *Bunnell* court protested that those analytical rules did not flow from the Social Security Act or its regulations at all. *Bunnell,* 947 F.2d at 348 (Kozinski, concurring only in the judgment).

were also rules of common sense, *e.g.*, that the opinion of a treating physician who has seen the claimant over a period of time, and was employed to cure that person, ordinarily should be accorded greater deference than the opinion of a physician who has never examined the claimant. While not directly controlling here, the principles developed in our social security jurisprudence often are instructive in analyzing other disability claims.

In evaluating Sandra Palmer's case, Dr. Kelly Krohn re-examined plaintiff (at Standard's request) and concluded that in his professional opinion she was presently unable to perform her duties as a Medical Claims Analyst. Standard rejected Dr. Krohn's opinion and deferred to its own contract physician (Dr. Fancher) who reviewed her file but did not meet or personally examine Ms. Palmer. While the opinion of a treating or examining physician may sometimes be discounted, Standard has failed to articulate adequate grounds in this instance for doing so. There is nothing in this record to impeach either the credentials of Dr. Krohn, who works for one of the foremost hospitals in this part of the country, or his methods. Rather, in the event of a difference of opinion between the treating physician and that of Standard's non-examining physician, Standard's practice is to defer to the latter. Steel Depo. at 41–42.

Standard has emphasized the absence of gross abnormalities detectable through tests such as x-rays, bone scans, and neurological testing. However, Dr. Krohn was well aware of those findings at the time he filed his report (with the exception of the neurological testing, which was performed several months later). The purpose of those examinations was to scan for certain specific conditions that might be the source of the pain. There is nothing in the record to indicate that a negative examination necessarily means Ms. Palmer is not suffering from severe back pain; rather, these tests were designed to rule out certain specific causes so as to narrow the likely source of the pain and decide how best to treat it. Nor is there anything in this record which shows that musculoskeletal pain cannot be severe or in some instances disabling.

Although Dr. Krohn was unable to point to a specific cause of the pain on an x-ray, he did not doubt that Ms. Palmer was in fact suffering from severe pain which was exacerbated by her employment. Nor, according to this record, have Ms. Palmer's other physicians ever questioned her credibility or her description of her symptoms. While Standard was concentrating on the lack of "objective medical evidence," it simply ignored plaintiff's subjective complaints of pain. Although Standard was not obliged to blindly accept plaintiff's subjective complaints at face value, Standard failed to articulate adequate reasons for discounting those complaints. The only reason that Standard offered for discounting those complaints is that "the subjective complaints far outweigh the clinical findings." However, that is true in all cases of "excess pain," which is why the claimant's credibility is significant in such cases.

Standard made no credibility findings whatsoever, even though there was important evidence in the record concerning this issue. Before Standard made its initial decision to deny benefits, it was specifically advised by Tom Harris of Benefit Planning, the insurance broker for UMG, that "Sandra Palmer ... is in pain—that is agreed upon by supervisors, co-workers.... Ms. Palmer seems honest and [Harris] doesn't think she would lie about her condition." (R 57). Standard never mentioned this evidence in any of its decisions.

When plaintiff's counsel requested a copy of all documents on which Standard had relied in making its decision, Standard deliberately removed that particular document from the file before making a copy of the remaining records and mailing them to plaintiff. When plaintiff asked that penalties be imposed upon Standard for withholding that document, Standard responded that it was not liable because it had in fact provided plaintiff with a copy of all documents on which it had relied in making its decision. Memorandum in Support of Defendants' Motions for Summary Judgment at 17.

I will take Standard at its word and assume that it did not rely upon this document in making its decision. However, Standard's argument proves too much. If Standard did

not rely upon that document, then Standard failed to consider all pertinent evidence available to it. Again, the problem is that Standard was fixated on "objective medical evidence," to the exclusion of all other evidence that might tend to support Ms. Palmer's subjective complaints of pain, hence Standard did not consider evidence of plaintiff's credibility to even be relevant to its inquiry. Similarly absent both from Standard's formal decisions and its internal decisional documents was any discussion of Ms. Palmer's activities outside of work (or the present lack thereof) and its consistency with her claimed symptoms.

■ At oral argument, and in its briefs filed with this court, Standard attempted for the first time to articulate legitimate reasons for discounting plaintiff's subjective complaints or her physician's conclusion that she was disabled. That was too late. If Standard's decision is to be affirmed, it must be on the grounds and for the reasons that were articulated in its decision, not some new grounds propounded for the first time in this court by Standard's attorneys.

In any event, Standard's arguments are unpersuasive. Standard notes that Ms. Palmer continued to work for almost 15 years while suffering from back and neck pain, and cites that as proof that she was not disabled. It equally tends to prove that she was not malingering. Despite her pain, for which she had been receiving medical care for all those years, she continued to work. The record shows that at times the pain was severe enough that she missed a few days, weeks, or even months, but she always returned to work. When her back and neck problems became too severe to continue working as a waitress, she obtained training so she could start a new career in data entry and other office jobs.

Standard argues that there is no evidence her condition when she left work was any worse than it had been several months or even several years earlier. That is incorrect. The record shows that her condition had been exacerbated since 1994, when her workload reportedly was quadrupled. According to some reports, she was now required to sort 7,000 to 12,000 forms every Monday. (R 72, 145). Her employer estimated that she processed 4,000 "claims" per week (though there may be more than one form per claim, which might explain the difference). (R 84). In either case, plaintiff has consistently attributed her recent back problems to that increased workload.[10] In addition, Ms. Palmer was now approaching age 60, and her body likely was less resilient then it had been when she was younger.

Standard asserts a number of other arguments for the first time before this court. For instance, Standard argues that plaintiff initiated the disability claim process on October 4, 1995, but continued to work until October 27, 1995, which in its view proves that she was not disabled. However, the record shows that plaintiff was concerned that her employer could not obtain a replacement for her until the disability leave forms had been processed, and therefore stayed on for a little longer so as not to leave her co-workers under-staffed. It appears that she also needed to obtain a physician's certification before receiving a leave of absence pursuant to the Family and Medical Leave Act. Finally, the record before this court does not disclose whether plaintiff missed any hours or days during this period, or the amount of pain she was in, hence this does not establish that she was not disabled.

Standard also argues that plaintiff's earlier physicians never said that she was disabled. However, there is no evidence that they were ever asked to furnish an opinion on that specific topic nor should they be expected to have volunteered such an opinion on their own. Ms. Palmer consulted them for the purpose of relieving the pain so she could continue to work, and it was to this end that their efforts were directed.

Standard asserts that plaintiff's decision to leave work entirely was an over-reaction. Standard concedes that, consistent with Dr. Krohn's letter of September 19, 1995, plaintiff might have needed to leave work early or occasionally miss work due to her severe pain, but that would not preclude her working at all. However, the record before this

10. When asked to "describe any significant factors that may contribute to the amount of stress associated with this position," her employer candidly responded, "The volume of work." (R 85).

court does not disclose whether plaintiff's employer was willing to let her leave early or take time off from work whenever she felt the need. On the contrary, according to the "Employer's Statement" dated November 3, 1995, the employer had not "considered allowing the claimant to work in another occupation, or modify or alter the job duties of the claimant's occupation, how the job is done (i.e., work schedule), or worksite." (R 131).

In addition, under the terms of the long-term disability policy, during the first 24 months the plaintiff was considered to be disabled if she was either "unable to perform with reasonable continuity the material duties of [her] own occupation" OR was "[u]nable to earn more than 80%" of her indexed predisability earnings. If plaintiff's back condition necessitated a significant reduction in her work schedule, then she would be entitled to temporary benefits under the terms of this Plan anyway.

In its decisional documents, Standard also placed great significance upon the fact that plaintiff's job is classified as "sedentary." In the opinion of Dr. Fancher, "patients with chronic mechanical back pain due primarily to muscular factors should be able to perform sedentary work on a full-time basis." The danger in relying upon such generalizations is that "sedentary" is merely a general term given to a wide range of occupations that can be performed while seated and do not require the lifting of heavy objects. Not all "sedentary" jobs are equal, nor does the term "sedentary" necessarily describe all physical requirements of that job. The evidence indicates that plaintiff was routinely required to sort thousands of documents at a time, and that her present symptoms were exacerbated by the physical demands of her job.

For purposes of this action, what matters is not the physical demands of some hypothetical sedentary job but the demands of the job that plaintiff occupied as she customarily performed it. Under the terms of this particular Plan, during the first 24 months an employee is deemed to be disabled if she cannot perform the duties of her own occupa-

tion, not some other hypothetical sedentary occupation.

It is not necessary for me to decide whether plaintiff is, or is not, disabled, or the duration of any such disability. Nor need I decide whether it might have been possible for Standard to articulate adequate grounds for denying her claim. Instead, this court's review is limited to the decision that Standard actually made and the reasons that Standard actually advanced at the time it made that decision. I conclude that (1) the record before me does not support the conclusions that Standard seeks to draw from it, (2) Standard abused its discretion by failing to consider all of the relevant evidence and the relevant factors, (3) Standard erred by discounting the opinion of plaintiff's treating physician, which was supported by substantial evidence, in favor of the opinion of a non-examining physician without articulating an adequate basis for doing so, (4) Standard erred by elevating "objective medical evidence" to the status of an absolute prerequisite without regard to whether it was possible to provide such proof in this instance or whether its absence necessarily precludes the presence of a disabling condition, (5) Standard erred by disregarding the plaintiff's subjective complaints without articulating an adequate basis for doing so, and (6) Standard committed additional errors as set forth above.

If this were a social security case, I would now have to decide whether to order an award of benefits or to remand the matter to the Secretary for reconsideration and/or further development of the record. However, the Ninth Circuit's decision in *Snow* appears to foreclose such remands. *See Snow,* 87 F.3d at 332–33. Consequently, it would appear that I am limited to two options: I must either affirm the challenged decision or else direct an award of benefits.[11] Since, for the reasons detailed above, I cannot affirm the challenged decision, I therefore will enter judgment in favor of the plaintiff and direct that she be awarded benefits. Even if I had the option to remand for reconsideration, I

---

11. In *Saffle v. Sierra Pacific Power Co.,* 85 F.3d 455 (9th Cir.1996), the court remanded the matter to the plan administrator because, as a result of an erroneous reading of the plan documents, the administrator "has not yet had the opportunity of applying the Plan, properly construed, to Saffle's application for benefits." *Id.* at 460. That circumstance is inapposite here.

would choose not to exercise it in this instance. The purpose of disability insurance is defeated if it is not available when needed. Plaintiff has been out of work for more than two years, and should receive her benefits as soon as possible.

My ruling here is limited to the particular decision by Standard that is before me today. I express no opinion as to whether plaintiff continues to be disabled within the meaning of the policy, or whether her condition satisfies the stricter definition of disability that applies after 24 months.

### 4. The Merits, Part Two:

■ I also have considered how I would resolve this case applying the standards articulated in *Lang*. The initial question is whether plaintiff has produced "sufficient probative, material evidence that Standard may have acted in its own self-interest." *Lang*, 125 F.3d at 798. It is not clear what form that evidence must take, or from where it is to be derived.[12]

In the instant case, plaintiff first sought to examine the internal procedures employed by Standard to review claims. Before I precluded further discovery, plaintiff had deposed the claims analyst who denied plaintiff's claim and discovered that—although this analyst decides as many as 50 claims a month—he has *never* been reversed by Standard's internal appeals procedures. Rubenstein Depo. at 77–79. The same is true of a second Standard claims analyst whom plaintiff deposed; of all the hundreds or more likely thousands of claims she has reviewed, she was reversed only once by Standard's internal review process and that was because new medical evidence was submitted. Bibb Depo. at 22.

12. In *Lang* the court found that inconsistencies in the reasons Standard gave for denying benefits constituted material, probative, evidence that its decision was affected by self-interest. This led to a de novo review and an award of benefits. It appears that pursuant to the *Lang* decision a claimant with the *identical* policy and *identical* physical condition could effectively be denied benefits if the reasons given for the denial by the plan administrator are not inconsistent.

13. While that might suffice to establish taint in this case, I continue to have my doubts as to the long-term viability of this analytical framework.

Perhaps these analysts are very good at their jobs that and are always correct, and there is no room even for a difference of opinion. However, it seems more likely that—notwithstanding Standard's representation that it was "referring Ms. Palmer's file to our Quality Assurance Unit for an independent review" (R 23)—this so-called "independent review" by Standard is not totally independent. That is especially significant because ERISA expressly requires every employee benefit plan to:

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. During those depositions, plaintiff also uncovered evidence that Standard's practice is to credit the opinion of its own non-examining physician over the contrary opinion of the treating physician(s). *See, e.g.*, Steel Depo. at 41–42. The inference is that the process is weighted in favor of Standard and against the claimant.[13]

Alternatively, the evidence of taint may be confined to that which is found in the administrative record itself. In *Lang*, the court decided that the plaintiff had met its burden by pointing to "inconsistencies in the reasons Standard gave for its" decision. *Lang*, 125 F.3d at 799. As a practical matter, this methodology may be conducive to results-oriented analysis; if the court agrees with the decision below then that decision will seem very rational and consistent, and vice versa. Putting aside those misgivings, I conclude that in this case there were a number of irregularities in the way that Standard handled this claim. For instance, critical evidence that supported the plaintiff's

If the outcome of the conflict of interest analysis hinges upon the company's internal rate of reversal, then it could occasionally reverse a claim denial (perhaps one which otherwise would have been granted anyway) just to retain the appearance of fairness—or at least that is what the claimants will allege. The court will then become bogged down in disputes over collateral matters such as the integrity of the company's internal claims review process, and the plaintiffs will want broad discovery of both documents and employees of the insurer to ferret out proof of taint.

claim—specifically, the opinions of her co-workers and supervisors that she was in pain and was an honest woman who would not lie about her condition—was not considered by Standard and was intentionally withheld from the documents that were provided to plaintiff's counsel.[14] I have described a number of other circumstances elsewhere in this opinion, and will not repeat them all here. I conclude that plaintiff has met her burden to proffer evidence that the decision was tainted by self-interest.

The burden then "shifts to the plan administrator to show that its decision was in fact in furtherance of its fiduciary responsibilities." *Lang*, 125 F.3d at 799. Frankly, I have no idea how the plan administrator would go about such a task under the circumstances of the instant case. It cannot be enough to offer an affidavit of good faith, or to recite that the administrator has an obligation to the other participants and beneficiaries of the Plan to deny invalid claims in order to keep their premiums from being increased or to preserve the Plan's assets. If that answer were sufficient, it would provide a defense to the charge of conflict of interest in every case.

In theory, the administrator could attempt to meet its burden by defending its decision on the merits, but that brings us full circle: if the court agrees with the decision on the merits, then the administrator has successfully refuted the plaintiff's evidence of taint, and vice versa. The conflict of interest analysis would become a surrogate for reviewing the decision on the merits, but at the cost of bogging down the judicial process in collateral matters. Surely that is not what the *Lang* court had in mind.

The bottom line is that I am charged with deciding whether the plan administrator has shown "that its decision was in fact in furtherance of its fiduciary responsibilities," yet I do not have a clear picture of what Standard must prove, or how it is supposed to go

about doing that.[15] I am reminded of Justice Stewart's observation that he could not intelligibly define obscenity, "[b]ut I know it when I see it, and the motion picture involved in this case is not that." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). I conclude that whatever it is that defendants are required to prove in order to rebut the inference of taint, they haven't done it. Consequently, *Lang* would require that the decision to deny benefits be reviewed *de novo*. In this case, I would rule for the plaintiff. Defendant has not articulated sufficient grounds for disregarding Dr. Krohn's opinion (in favor of the opinion of a non-examining physician) or for rejecting the plaintiff's subjective description of her symptoms and limitations.

### 5. *Failure to Produce Documents:*

 Plaintiff seeks $100 per day in penalties because defendant Standard did not produce certain documents in response to a written request from plaintiff's counsel. For purposes of this motion, Standard does not dispute that the documents were not provided, but does dispute (1) whether the statute authorizes the assessment of penalties against Standard, and (2) whether the documents withheld are within the scope of the document request. 29 U.S.C. § 1133 provides that:

> In accordance with regulations of the Secretary, every employee benefit plan shall:
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by

---

**14.** In fairness to the Standard employees involved, this could also have been an innocent mistake on their part. Again, I am very uncomfortable with an analytical framework that focuses upon the motives of the decisionmaker instead of the merits of the decision or a cogent explanation thereof. I also am reluctant to conduct a mini-trial on such collateral matters.

**15.** Nor is it clear whether Standard is limited to the evidence in the administrative record, or if it can supplement that record, or if a trial would be required to resolve any factual disputes concerning this issue.

the appropriate named fiduciary of the decision denying the claim.

If most ERISA benefits decisions are to be reviewed only for abuse of discretion, upon the record established below, then these requirements assume added importance. The Plan's internal review process may be the claimant's last genuine opportunity to influence the final decision, to supplement the record in preparation for judicial review, or to correct any errors in the existing record. Meaningful participation in this internal review process therefore requires that the claimant have an opportunity to review the relevant documents in the claim file so the claimant may submit any additional documents, correct any errors in the record, point to any favorable evidence that would tend to support the claim, fully understand the reasons for the decision that is being appealed, and to otherwise prepare an informed response to that decision.

To implement 29 U.S.C. § 1133, the Secretary has promulgated 29 C.F.R. § 2560.503–1(g)(1), which requires that as part of this appeal process every plan "establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to ... (ii) Review pertinent documents ..." In the instant case, the "pertinent documents" are the administrative record, including all documents which the claims administrator considered or relied upon when it decided to deny benefits.

On May 16, 1996, Standard sent a letter to plaintiff's counsel, Alan Graf, requesting that Graf submit to Standard any additional information that he wished to have considered as part of his client's appeal. On June 4, 1996, Graf wrote back to Standard:

> Thank you for your letter of May 16, 1996 explaining your policy of review. Pursuant to ERISA law, I request copies of all plan documents and copies of all documents, notes and medical records you have used in your decision-making process regarding my client.
>
> Thank you for your prompt attention to this matter. As the law specifies, I expect to receive the requested materials within 30 days of my request.

On June 11, 1996, apparently in response to a request from Standard, Graf faxed Stan-

dard a signed release from his client authorizing Standard to furnish Graf with "All long term disability plan documents, as well as all medical records, notes and other documents used in making the decision concerning my application for long term disability benefits." Later that same day, Standard wrote to Graf:

> This letter is in response to your letter of June 4, 1996, in which you requested copies of all plan documents and copies of all documents, notes and medical records used in our decision-making process regarding Ms. Palmer's claim.
>
> As you are aware by now, the review of the decision to deny Ms. Palmer's claim has been completed. A summary of our findings are as outlined in our letter to you dated May 31, 1996. A copy of this letter as well as the documents per your request have been enclosed.
>
> If you have any additional questions or concerns, we invite you to please contact our office or call me ...

After this lawsuit was filed, defendants duly filed with the court a copy of the administrative record. Upon comparing that record with what had previously been received from Standard, plaintiff discovered a number of additional documents that had been withheld from him. 29 U.S.C. § 1132(c)(1) provides, in relevant part, that:

> Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

Standard's first contention is that § 1132(c)(1) permits penalties to be assessed only against the "plan administrator." 29 U.S.C. § 1002(16)(A) defines the term "administrator" as "the person specifically so

designated by the terms of the instrument under which the plan is operated" or, "if an administrator is not so designated, the plan sponsor ..." The Plan designates defendant UMG as the "plan administrator." UMG also is the plan's sponsor. At first glance, that might seem to preclude any liability for Standard. *Cf. Moran v. Aetna Life Ins. Co.,* 872 F.2d 296 (9th Cir.1989) (entity that falsely held itself out as the plan administrator was not subject to penalties under § 1132(c)(1) for failing to furnish documents that the plan administrator was required to provide, rejecting contention that entity was estopped to deny its status).

In the instant case, however, the plan administrator delegated the entire claims process to Standard as the claims administrator. All communications concerning plaintiff's claim were with Standard. It was Standard that reviewed plaintiff's claim and made the decision to deny benefits. The notice denying benefits was on Standard's letterhead. It was also Standard to whom Plaintiff appealed that decision, and to whom any additional evidence or argument was to be submitted. Standard made the final decision to deny plaintiff's appeal, and the notice denying that appeal was on Standard's letterhead. Plaintiff's request for documents that she needed to pursue her claim was submitted to Standard, who purported to furnish them.

When the plan administrator has expressly delegated to a third party the performance of certain duties, and participants have been instructed to direct all communications to that delegee, arguably the latter has assumed responsibility for performing those duties and may be held liable for the failure to do so. *See Rosen v. TRW, Inc.,* 979 F.2d 191, 193–94 (11th Cir.1992) (where named administrator had delegated duties to alter ego who was actually administrating the plan, the latter could be held liable for breach of those duties); *Law v. Ernst & Young,* 956 F.2d 364, 372–73 (1st Cir.1992) (company could be held liable under § 1332(c)(1) for failing to timely furnish requested information where it "had assumed and controlled the plan administrator's function of furnishing required information in response to a plan beneficiary's request.") *But cf. McKinsey v. Sentry Ins.,* 986 F.2d 401, 404–05 (10th Cir.1993) (actions of delegee are imputed to named plan administrator, but only the latter may be held liable).

*Moran* is distinguishable from the present case because plaintiff is not proceeding on the estoppel theory that the majority in *Moran* found so problematic; rather, the plan administrator specifically delegated certain duties to Standard and plan participants were instructed to direct their requests to Standard. Indeed, there would have been little point in plaintiff directing her request to UMG, since all of the pertinent documents were in the possession of Standard.

Assuming that Standard could be held liable under 29 U.S.C. § 1132(c)(1), however, I conclude that in this instance it would be inappropriate to impose such a penalty. The purpose for allowing plaintiff to examine the documents in her file is so that she can meaningfully participate in the review process mandated by § 1133. Plaintiff's document request was dated June 4, 1996. Standard's final decision denying plaintiff's appeal was dated May 31, 1996. Consequently, plaintiff's request was filed too late for the documents to have been of any use in that appeal.

Since penalties would be inappropriate here, I decline to address Standard's alternative argument that the penalties imposed by § 1132(c)(1) are not applicable to a failure to furnish documents pursuant to § 1133, since it is not "a request for any information which such administrator is required by this subchapter to furnish to a participant ..." *Cf. VanderKlok v. Provident Life & Accident Ins. Co.,* 956 F.2d 610, 618 (6th Cir.1992) (reasoning that § 1132(c)(1) is inapposite because the duties of § 1133 are imposed upon the "plan," but not explaining how a "plan" can take any action in its own right as opposed to acting through its human representatives).

### CONCLUSION

The cross-motions for summary judgment (docket #10–1 and #64–1) are each GRANTED in PART and DENIED in PART. After reconsidering the issues in light of the Ninth Circuit's decision in *Lang,* the court adheres to its earlier rulings regarding the scope of discovery and the standard of review applicable to this action. Defendants' decision denying plaintiff's claim for disabili-

ty benefits is REVERSED. Plaintiff's request for penalties under 29 U.S.C. § 1132(c)(1) is DENIED. Plaintiff's motion (# 64–2) to supplement the record is CONDITIONALLY GRANTED for purposes of the *Lang* conflicts analysis only, to the extent that test is applicable to this case.