**Warren J. THOMPSON, Plaintiff,**

v.

**STANDARD INSURANCE COMPANY, an active Oregon Corporation, Defendant.**

No. CIV. 99–6168–TC.

United States District Court, D. Oregon.

May 21, 2001.

Gene Barry Mechanic, Giles H. Gibson, Goldberg Mechanic Stuart & Gibson L.L.P., Portland, OR, James D. Vick, Vick & Conroyd, LLP, Salem, OR, for Plaintiff.

## ORDER

COFFIN, United States Magistrate Judge.

This is an ERISA benefits case. Plaintiff made a long term disability claim pur-

suant to a disability insurance plan (the Plan) issued by defendant Standard Insurance Company. Defendant denied the claim and plaintiff now challenges the denial.

## STANDARDS

Presently before the court is defendant's motion for summary judgment and plaintiff's cross-motion for trial on the record and judgment. The motion for summary judgment fails as there are genuine issues of material fact. The motion for a trial on the record is more appropriate. Trial of an ERISA claim "on the record" is similar to summary judgment in that the court decides the case based on its review of the documentary record and parties' briefs. Trial on the record is different from summary judgment, however, in that the court actually decides factual questions. Thus, in a trial on the record,

> [t]he district judge will be asking ... as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the [plan]. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Kearney v. Standard Insurance Co.,* 175 F.3d 1084, 1095 (9th Cir.1999).

The parties agree that the court is to apply a *de novo* standard of review in its review of the record.

## FACTUAL BACKGROUND

Plaintiff Warren Thompson is a partner in the Salem, Oregon accounting firm of Winedahl Peters & Thompson and was insured as such at relevant times under the Plan that Standard issued to the Marion Development Trust.

In 1994, Mr. Thompson began experiencing pain and stiffness in his left knee, which had twice previously been injured to the extent of requiring surgery. The first injury, in approximately 1964, had led to a medial meniscectomy. The second, some ten years later, resulted in lateral meniscectomy. The pain and stiffness that started in 1994 occurred whenever Mr. Thompson engaged in any significant physical activity. Mr. Thompson had also been injured in an auto accident in 1991 that resulted in his having a laminectomy to relieve radiculopath in the lower cervical area.

In 1995, Mr. Thompson's knee pain and stiffness continued and the knee began swelling when aggravated. The pain and swelling grew progressively worse and came to be accompanied by a grating sensation and a feeling of overriding of material within the knee joint. In early 1996, Mr. Thompson experienced repeated flareups of pain and swelling accompanied by crunching and/or catching sensations in the knee. He sought treatment from Dr. Malcolm P. Snider, an orthopedist. Dr. Snider initially prescribed Relafen, a non-steroidal anti-inflammatory drug ("NSAID"). When Relafen proved ineffective, Daypro (another NSAID) was prescribed, but it did not resolve the problem either.

In April 1996, Dr. Snider performed arthroscopic surgery on the knee. This temporarily resolved the swelling, but the pain and stiffness persisted. Unless he took 3200 mg of ibuprofen a day, Mr. Thompson was stiff and sore in the morning. Dr. Snider noted "significant inflammatory synovitis" and referred Mr. Thompson for a rheumatology consultation to Dr. Stephen R. Stewart, a rheumatologist.

When first examined by Dr. Stewart on June 5, 1996, Mr. Thompson was experiencing stiffness in his hips as well as his knee, and soreness in his right shoulder

and spine. His left knee and hips were stiff and sore for about two hours each morning, and he became stiff any time he sat for more than an hour. Any significant physical activity exacerbated the pain, which occasionally radiated into his proximal thigh and was particularly bothersome at night, when it precluded restful sleep.

Dr. Stewart found the knee warm with soft tissue swelling, moderate effusion, and tenderness along the joint line. He noted that the synovial biopsy Dr. Snider had taken during the arthroscopic surgery in April showed "chronic inflammatory synovial hyperplasia", and opined that "although [it is] superimposed upon degenerative changes due to preexisting injury and surgery, the inflammatory synovitis and effusion are undoubtedly indicative of a more inflammatory process." R. 272, attached to Somervell Affidavit (# 52). Dr. Stewart diagnosed spondyloarthritis.

Dr. Stewart initially put Mr. Thompson back on NSAIDs. Later, on July 12, 1996, he injected cortisone into the knee. Apart from a temporary improvement immediately following the injection, however, Mr. Thompson continued to have debilitating pain in his left knee and hips that interfered with his sleep and hours worked. Snyovial fluid withdrawn from the knee on July 12 showed inflammation consistent with spondyloathritis and cartilage fragments consistent with a degenerative element. Dr. Stewart concluded based on Mr. Thompson's serologies that he did not have rheumatism, however. Dr. Stewart also noted that pain complaints were disproportionate to the level of demonstrated articulate involvement.

On July 19, Mr. Thompson saw Dr. Stephen Paulissen, his primary care physician, and complained that he was unable to sleep and found it difficult to work due to constant, aching pain in his left knee and hip. Dr. Paulissen prescribed hydrocodone for pain. In seeing Dr. Paulissen again on August 26, Mr. Thompson reported he was working fewer hours than usual due to his continuing pain and stiffness. Dr. Paulissen referred him then for a rheumatology consultation to Dr. James T. Rosenbaum, a rheumatologist and professor of medicine at the Oregon Health Sciences University (OHSU) in Portland.

On September 6, Dr. Stewart noted that despite some limited improvement with the NSAID Feledene, Mr. Thompson was only able to work half a day or less each day.

On October 24, Mr. Thompson saw Dr. Snider and expressed frustration with his continuing arthritic problems, and particularly his inability to sleep or to work at his usual level.

By October 30, when he first consulted Dr. Rosenbaum at OHSU, Mr. Thompson was experiencing pain in both knees and hips, and in his wrists and the small joints of his hands. His pain continued to interfere with his sleep and work, and sharply limited his ability to sit for more than 45 minutes. Dr. Rosenbaum diagnosed symmetric polyarthritis, and noted that the symptoms suggested rheumatoid arthritis. He prescribed Plaquenil and Prednisone. He later concluded, however, (as had Dr. Stewart), that Mr. Thompson's problems could not be attributed to rheumatism. After a second appointment on November 12, Dr. Rosenbaum took Mr. Thompson off Prednisone, but continued the Plaquenil and started him on Amitryptilline.

Although the medications he was taking sometimes brought about temporary improvements in Mr. Thompson's pain, it continued to plague him and interfere with his sleep and work. By July 1996 he had stoppe working full time and was working just three to four hours per day. He repeatedly attempted through Fall and Winter 1996–97 to resume and sustain a higher level of activity, but a recurring pattern developed in which his attempts to work longer hours or engage in significant-

ly exertional non-work activity were punished by subsequent backlashes of pain and/or stiffness and fatigue. Thus, for example, he noted in an activity diary that he kept for Dr. Rosenbaum beginning in November 1996 that using a calculator for just four hours on December 2 (more than he had done for several months previously) caused intense stiffness in his hands which bothered him that evening and continued into and limited his activity the next day. Before the onset of his chronic arthritic pain, Mr. Thompson had been an avid and active golfer; he found in 1996, however, that he could no longer golf at all other than from a cart (thus avoiding the need to do any significant walking). Even when using a cart and taking pain medications to get through it, golfing now caused him such backlashes of pain, stiffness and fatigue that he typically had to spend the rest of the day and the next day recovering. Early in 1997, he twice pushed himself to work a full day, only to find he was so fatigued the next day that he could hardly get out of bed. When he saw Dr. Rosenbaum on January 22, 1997, the doctor kept Mr. Thompson on Plaquenil and Amitryptilline, and started him on Sulfasalazine, and Vicodin for pain as well.

As the quantity of work he could perform declined, so too did Mr. Thompson's income. As a full partner in the accounting firm from 1993 through 1995, his annual income averaged $98,323. In 1995, he earned $103,148. But partners had always been required under the firm's partnership agreement to work at least 1500 hours per year (or 125 per month) for the firm, and Mr. Thompson did not meet the requirement after June 1996. From July through December that year, he worked a total of just 373 hours. His income for the year fell to $60,661 as a result.

In recognition of Mr. Thompson's chronic arthritis and continuing inability to work full-time, the firm amended its partnership agreement in early 1997 to excuse him from the minimum work hours requirement. In exchange, he was also excluded from the partners' usual compensation formula and instead paid only $2500.00 per month, or $30,000 per year. As a result, his total income for 1997 was just $30,000.

Mr. Thompson continued to see Drs. Paulissen and Rosenbaum in 1997 and 1998. In April 1997, Dr. Paulissen first prescribed Paxil for depression. He later referred Mr. Thompson to a psychiatrist, Dr. Roselee Cain, for further treatment for depression, and Mr. Thompson began treating with Dr. Cain in July 1997.

On May 1, 1998, Mr. Thompson applied to Standard for disability benefits. In identifying his disabling condition then, he noted that severe arthritis pain in his knees and hips prevented him from sitting for long periods; that pain in his hands and wrists made writing and typing difficult; that he was unable to work more than three or four hours a day; and that his use of pain medications often made it impossible to concentrate on his job responsibilities.

On the attending physician's statement that Dr. Paulissen submitted in connection with the claim, Dr. Paulissen diagnosed polyarticular inflammatory arthritis with pain in multiple joints, especially knees, hands and feet; stiffness; inability to walk much; and a need to change positions frequently. He noted that Mr. Thompson "can only work 6 hours or less per day with a reduced workload (not 50 of his pre-illness work production)"; that his condition is chronic an that he will need chronic medication treatment and permanent restrictions on his activity and work. Dr. Paulissen further indicate he did not expect a change in Mr. Thompson's condition, noting "Chronic condition. No cure. Medicines help manage the chronic pain." R. 341 attached to Sommervell Affidavit (# 52).

Dr. Cain submitted a statement on June 4, 1998 diagnosing major depressive disorder, single episode, moderate. Dr. Cain specifically noted Mr. Thompson's inability to continue working full-time due to his chronic pain: "severe chronic pain severely limits his ability to work as he used to in the past". In response to a "malingering" question (on Standard's reporting form), Dr. Cain wrote "no signs, symptoms, or suspicions of malingering." R.198, attached to Sommervell Affidavit (# 52).

The Plan's definition of disability is as follows:

You are DISABLED from your own occupation if, as a result of SICKNESS, ACCIDENTAL BODILY INJURY or PREGNANCY:

(1) You are unable to perform with reasonable continuity the material duties of your own occupation; OR

(2) You are unable to earn more than 80% of your INDEXED PREDISABILITY EARNINGS while you are actually working in your own occupation.

Part 5A of Plan, R. 361–362, attached to Somervell Affidavit (# 52).

On August 4, 1998, Standard claims analyst Kim Derochie forwarded Mr. Thompson's file to a consulting physician for review. Having analyzed Mr. Thompson's hours and earning records and the firm' partnership agreement, Ms. Derochie had already determined then that he was not earning 80% of his predisability earnings. Her memo to the Doctor noted that Mr. Thompson had "stopped working with reasonable continuity July 1, 1996" and was "claiming disability for arthritis"; it asked the doctor to review the medical records and comment on whether they "supported inability to perform sedentary occupation full time beginning any time between July, 1996 and January 17, 1997?" R. 81.

On August 20, 1998, Standard's consulting physician, Dr. Ronald Frabeck, responded to Ms. Derochie's inquiry. After briefly summarizing Mr. Thompson's treatment with Doctors Stewart, Paulissen, Rosenbaum and Cain, his memo concluded, in part, as follows:

Although his treating physicians seem convinced that Mr. Thompson has significant pain, he has had very little objective findings in terms of joint swelling, laboratory abnormalities, etc. A bone scan done in January 1997, a sensitive marker for inflammatory arthritis, was within normal limits. Therefore, I don't find objective information in the file of any medical condition that would preclude sedentary work on a full-time basis between July 1, 1996 and January 17, 1997.

R.79.

On September 19, 1998, Standard sent Mr. Thompson a letter denying his claim. The letter stated that Mr. Thompson's medical records had been reviewed by Standard's physician consultant, and further that:

The medical documentation in your file indicates you have had very little objective findings in terms of joint swelling or laboratory abnormalities. A bone scan completed in January 1997 was within normal limits.

We are not disputing that you may have experienced some limitations and restrictions at the time you reduced your work hours. However, we have determined that the medical evidence presented does not substantiate a level of impairment that would prevent you from working in your own occupation.

R.65.

By a letter to Standard dated September 28, 1996, Mr. Thompson requested a review of the denial decision. In November, while that review was pending, he established and Standard acknowledged that the bone scan relied on by Dr. Frabeck and specifically referenced by Standard in denying his claim had actually

been taken in 1987 (not 1997), some ten years earlier. Mr. Thompson notified Standard that he would submit a current bone scan for its consideration.

In a letter to Standard dated November 5, 1998, Dr. Paulssen summarized his treatment of Mr. Thompson since July 1996 and communicated his then recent conclusion that Mr. Thompson has fibromyalgia as well as symmetrical polyarthritis. After referring to the "aggressive regimen of Plaquenil, sulfasalazine and ibuprofen" undertaken at Dr. Rosenbaum's direction to treat Plaintiff's arthritis Dr. Paulissen wrote that:

During the time that the patient was treated with these medicines he was observed and treated for depression in my office ... I subsequently referred him to a psychiatrist who is experienced in treating chronic pain and related depression.

The patient currently continues to be treated aggressively for symmetrical polyarthritis with Plaquenil and sulfasalazine and non-steroidal anti-inflammatory agents.

The patient's course has improved slightly but not remarkably. Recently the patient was evaluated for fibromyalgia and has been diagnosed with fibromyalgia syndrome. The symptoms of ... inflammatory arthritis and fibromyalgia are similar and overlap. The symptoms of fibromyalgia include general achiness, stiffness of the hands and chronic fatigue, as well as having tender points in soft tissues associated with fibromyalgia.

The patient's work requires him to sit all day and analyze complex data. The patient is unable to sit all day at present and can sit a maximum of 20 to 30 minutes uninterrupted. He has had difficulty with concentration which is a symptom of fibromyalgia as well as of being in chronic pain...

The patient has tried numerous methods of extending his work day but he now is unable to and should not work more than three or four hours per day. In conclusion, the patient has fibromyalgia syndrome which has been present since his symptoms began in late 1995 or early 1996. The observation of his illness over the last two years is helpful in confirming this as a diagnosis. He also is being treated aggressively for symmetrical polyarthritis of an inflammatory type. These illnesses have caused a significant decline in his ability to function and work at the levels he did prior to the onset of these symptoms.

The patient is disabled within the definitions of the policy you have issued and has been since 1996.

R.42–43.

On November 10, 1998, Dr. Rosenbaum had a Whole Body Bone Scan taken of Mr. Thompson in the Nuclear Medicine Division at OHSU. Image of the entire skeleton were taken three hours after intravenous administration of technetium. The resulting report states:

FINDINGS: There is abnormal uptake in multiple sites consistent with degenerative arthritis. These include the acromioclavicular joints bilaterally (especially on the left), the right glenohumeral joint, the left knee (both medial and lateral compartments), the right first metatarsophalangeal joint, and the small focus in the left wrist. In addition, there is mild increased uptake in the lower cervical spine, consistent with patient's history of prior effusion.

IMPRESSION:

Findings consistent with degenerative arthritis involving the shoulders, left knee, right great toe, left wrist, and lower cervical spine.

R.37.

In a letter to Standard dated January 29, 1999, Dr. Rosenbaum opined that Mr.

Thompson's "inflammatory joint disease, widespread pain and difficulty with concentrating ... markedly interfere with his employment, and ... began well before January 17, 1997." R.20.

By a letter to Mr. Thompson dated February 26, 1997, Standard notified him of its final denial of his claim. That letter concludes by stating, in pertinent part, that:

> [B]ased on our review of the medical information in your claim file, we find insufficient proof that you had a physical or psychological condition that precluded you from performing with reasonable continuity the material duties of your own sedentary level occupation as a Certified Public Accountant through at least April 16, 1997.

R. 6.

## DISCUSSION

The parties agree that to be eligible for benefits, plaintiff must have become disabled prior to January 18, 1997. Defendant conceded at oral argument that it was not making a dispositive argument regarding the timeliness of the filing of the disability claim or an argument that plaintiff is a malingerer.

Defendant argues that plaintiff's health problems did not *totally* disable him from performing his occupation. P.p. 9–10 of Memo (# 53). Such argument and the content of the claim denial letters address a claim for total disability under the first clause of the Plan's definition of disability, but fail to defeat plaintiff's claim for par-

tial disability under the second clause of the Plan's definition of disability. In defendant's Reply and at oral argument, defendant acknowledged the potential applicability of the second clause, but argued that plaintiff's physical condition did not cause plaintiff to be unable to earn more than 80% of his predisability earnings. Defendant contends that, although plaintiff has health problems, the decrease in plaintiff's hours and income were plaintiff's choice and that there is insufficient evidence to show that plaintiff was disable under the terms of the Plan. I disagree.

■ Treating doctors Paulissen and Rosenbaum have treated plaintiff since July and October of 1996, respectively. They concur in opinion that continuously *since* then, plaintiff has had inflammatory joint disease, widespread pain, stiffness and difficulty with concentration that have limited his ability to work as an accountant. As such, treating doctors Paulissen and Rosembaum's opinions squarely support plaintiff's claim that his chronic arthritic pain renders him disabled under the Plan.[1]

■ Defendant's consulting physician reviewed plaintiff's records and stated that he could find no objective information of any medical condition that would preclude sedentary work on a full time basis. However, in contrast to doctors Paulissen and Rosenbaum, defendant's consulting physician was neither a treating or examining physician. A a general rule, more weight should be given to the opinion of a treating source than the opinion of doctors who do not treat or examin the claimant. *Palmer v. University Medical Group*, 994 F.Supp. 1221, 1234 (D.Or.1998).[2] The consultant's

---

1. Dr. Paulissen noted that plaintiff could not work at 50% of his pre-illness work production and defendant's claim analyst determined that plaintiff was earning less than 80% of his predisability earnings as required by the sec-

ond clause of the Plan's definition of disability.

2. *Palmer* is an ERISA case where Standard was a defendant. The *Palmer* court utilized the above principle of social security jurispru-

opinion and defendant's related arguments are[3] not entitled to much weight for other reasons as well. The opinion applies to sedentary jobs as a class which is no helpful in analyzing the relevant job in this matter, i.e., plaintiff' job as a C.P.A. Although such job may not have heavy physical demands unlike many other sedentary jobs, it requires concentration to analyze complex data. Plaintiff has provided unrefuted evidence demonstrating problems with concentration and sleep. Defendant's medical consultant did not address these problems in its opinion and defendant has not addressed them in its claim letters or legal memorandum to this court.

Moreover, the consultant's opinion is not persuasive and defendant's denial of benefits is not appropriate as they both make "objective medical evidence" of disabling pain an effective prerequisite to entitlement of benefits under the Plan.

As the Ninth Circuit has recognized and Standard has been cautioned before, "[m]erely because we cannot see pain or fatigue on a x-ray, or measure it in a laboratory, does not mean that it is not real." *Palmer v. University Medical Group*, 994 F.Supp. 1221, 1233 (D.Or.1998). As Judge Jelderks noted in *Palmer* in reversing another denial of benefits by Standard, "such procedures as x-rays and lab tests are only one component of the total picture" where pain and fatigue are concerned in a disability case. 994 F.Supp. at 1233. Other considerations include the professional opinions of the treating and examining physicians; the claimant's medical history; whether there is evidence of a condition that potentially could produce the sort of pain that is alleged, and the claimant's credibility. *Id.* As discussed below, these factors all militate in favor of finding plaintiff disabled within the meaning of the Plan.

As noted above, Dr. Paulissen and Dr. Rosenbaum are plaintiff's treating physicians. Their opinions fully support Plaintiff's claim, as do the records provided by doctors Snider and Stewart. Plaintiff's medical history also supports his claim by identifying contributing causes of the arthritis in his left knee (two prior surgeries) and lower spine (one prior surgery).

It is beyond dispute that arthritis, let alone fibromyalgia, is capable of producing the sort of pain of which Plaintiff complains. Arthritis is virtually synonymous with pain in common understanding, and both the Centers of Disease Control and the Social Security Administration recognize it as a disabling condition.

Court decisions in social security disability cases also recognize that arthritis is capable of producing "excess pain", i.e., pain above and beyond that which can readily be explained by reference to objective medical indicia. An example is the decision in *McKeral v. Heckler*, 630 F.Supp. 727 (D.Mont.1986). *McKeral* reversed a decision that had denied benefits because the claimant's subjective complaints of arthritis pain were not supported by objective medical evidence. A the court there noted:

> To require that medical evidence fully supports the claimant's complaints of pain ignores the reality that each person is an individual, with different reactions

---

dence in analyzing plaintiff's claim for long term disability, along with others, and stated, "[w]hile not directly controlling here, the principles developed in our social security jurisprudence often are instructive in analyzing other disability claims." 994 F.Supp. at 1235.

**3.** Plaintiff also has difficulties with typing, writing and using a ten key and can sit for only short periods. Plaintiff's job requires him to work productively and efficiently to make the requisite earnings without taking frequent breaks to stand and walk.

to similar injuries or conditions. For example, different persons have markedly different tolerances of, or sensitivity to, pain. Even so, that does not make the level of pain suffered by the sensitive individual any less real or disabling.[4]

Finally, there is no basis in the administrative record for concluding that Plaintiff is anything but credible. His contemporary writings—a handwritten letter and diary entries—reflect both his frustration with his inability to resume and sustain his predisability activity level and his sincere desire to do so. Standard's suggestion that Plaintiff just "chose" to cut back his hours has no substantial support in the record. The only evidence directly relevant to it is the statement of the psychiatrist, Dr. Roselee Cain, who treated Plaintiff for depression beginning in July 1997. In responding to a malingering question (on Standard's form questionnaire), Dr. Cain wrote that she saw neither signs nor symptoms of malingering in Plaintiff, and had no suspicions that he was malingering, either. R. 198.

Moreover, it is counterintuitive to suggest that a successful professional such as Plaintiff would voluntarily reduce his income by 70% at age 49, just as he entered the peak earning years of his career This is especially true since the disability benefits he seeks here will not restore him to anywhere near his predisability income level.

■ Defendant contends that the court must focus on the evidence in the record prior to January 18, 1997, to determine whether plaintiff was disabled under the terms of the Plan as of that date. Defendant contends that the attending physician

statement submitted by Dr. Paulissen with plaintiff's disability claim was generated in April of 1998 and does not establish the limitations plaintiff had on January 18, 1997. However, even if that were the case, "[t]he fact that a diagnosis is not made contemporaneously within the period that a claimant is insured does not undercut the viability of a later diagnosis based upon medically acceptable techniques. A diagnosis of plaintiff's condition may properly be made several years subsequent to the onset of the disability." *Gecevic v. Sect. of Health and Human Services,* 882 F.Supp. 278, 286 (E.D.N.Y.1995) (citations omitted). Moreover, Dr. Paulissen noted on defendant Standard's form that symptoms first appeared in April of 1996, that he has seen plaintiff since October of 1991 and that he has seen plaintiff for his arthritic condition every two to three months since July of 1996. Dr. Paulissen notes in his letter of November 5, 1998 that plaintiff has been disabled since 1996. In addition to numerous chart notes from plaintiff's doctors, Dr. Rosenbaum diagnosed symmetric polyarthritis on October 30, 1996. The opinion of Dr. Paulissen and the opinions of plaintiff's other doctors may be considered and are persuasive, especially in light of the rest of the record.

Defendant also notes entries in plaintiff's diary that indicated that plaintiff can golf and perform other activities. However, plaintiff can only golf using a cart (due to his condition) and plaintiff adequately addresses other activities and their subsequent effects such that the existence of plaintiff's disability is not in question. Moreover, as in social security jurisprudence, the disabled do not have to be

---

4. Defendant notes that one of Plaintiff's own doctors, Dr. Stewart, had stated at one point that Plaintiff's reported pain was disportionate to the level of articular involvement. However, in addition to the above discussions of pain, where medical findings confirm a

condition that would normally produce some pain, a claimant's testimony cannot be discounted solely because he complains of more pain than might be expected. *Stewart v. Sullivan,* 881 F.2d 740, 742.

reduced to complete immobility to be entitled to benefits and not all recreational activities (such as striking a golf ball poorly) are transferable to the work place.

### CONCLUSION

Defendant's motion (# 51) for summary judgment is denied. Plaintiff's motion (# 59) for trial on record and judgment is allowed. Plaintiff is entitled to benefits as he meets the definition of disability under Part 5A(2) of the Plan.