**Gregory DeLEON, an individual, Plaintiff,**

v.

**BRISTOL–MYERS SQUIBB COMPANY LONG TERM DISABILITY PLAN, UNICARE, and Core, Inc., Defendants.**

No. CIV.01–350–AS.

United States District Court, D. Oregon.

Jan. 28, 2002.

Megan E. Glor, Swanson Thomas & Coon, Portland, for Gregory Deleon, for Plaintiffs.

## OPINION and ORDER

ASHMANSKAS, United States Magistrate Judge.

Plaintiff Gregory DeLeon ("Plaintiff") filed this action asking the court to review the decision of defendant CORE, Inc. ("CORE"), terminating Plaintiff's long term disability benefits ("LTD Benefits") under defendant Bristol–Myers Squibb Company's Long Term Disability Plan (the "Plan"). Presently before the court are the parties cross-motions for summary judgment. Specifically, CORE and the Plan (collectively "Defendants") move for partial summary judgment on Plaintiff's First Claim for Relief for denial of disability benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks summary judgment on both his First Claim for Relief for denial of benefits and his Second Claim for Relief for a penalty for failure to provide documents under 29 U.S.C. § 1133(2).

## BACKGROUND

Bristol–Myers Squibb Company ("Bristol–Myers") hired Plaintiff as a full-time machinist in May 1991. As an employee of Bristol–Myers, Plaintiff was a beneficiary of the Plan. On April 23, 1992, Plaintiff re-injured [1] his back while moving his motorcycle. Plaintiff filed a claim for LTD Benefits under the Plan, which was approved effective November 3, 1992. Thereafter, Plaintiff's claim for LTD Benefits was regularly reviewed and his LTD Benefits were, on a few occasions, terminated and, shortly thereafter, reinstated.

In June 1999, CORE advised Plaintiff of their intent to review Plaintiff's claim for LTD Benefits from August 2, 1999. On December 21, 1999, CORE advised Plaintiff that they had determined that he was not totally disabled and would terminate his LTD Benefits effective February 1, 2000. Plaintiff filed both a Level I and a Level II appeal and on June 19, 2000, CORE advised Plaintiff that they upheld their prior decision that he was no longer totally disabled. Plaintiff filed this action on March 14, 2001.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

---

1. Plaintiff originally injured his back in a mo- torcycle accident in the early 1980's.

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.*, 765 F.Supp. 162, 165 (Del.1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## STANDARD OF REVIEW

 In actions to recover benefits due under an ERISA plan where the plan administrator denied benefits, the court employs a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan vests the administrator with such discretionary authority, a district court may review the administrator's decision only for an abuse of discretion. *Id.* The term "arbitrary and capricious" also describes this deferential standard of review. See *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 894 (9th Cir.1990). However, even if a plan gives discretion to an administrator, the court must weigh any conflict of interest that may have influenced the administrator's decision as a "factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber*, 489 U.S. at 115, 109 S.Ct. 948.

 The parties disagree on which standard of review is applicable in this situation. Defendants assert that the language of the Plan grants CORE, as claims administrator, discretion to determine a plan participant's eligibility for benefits under the Plan and that the exercise of such discretion must be evaluated under the abuse of discretion standard. Plaintiff argues that because the Plan itself does not appoint CORE as claims administrator, the delegation of the discretion to determine benefits under the Plan is ineffective. Under this scenario, Bristol–Myers would be both the funding source and the Plan administrator and would have an inherent conflict of interest requiring a stricter standard of review.

The Plan is funded through a group insurance policy issued to Bristol–Myers

by Occidental Insurance Company of California. Article I of the Plan designates the Corporate Senior Vice President, Human Resources of Bristol–Myers as the Plan Administrator and the "named fiduciary" of the Plan. Claims Administrator is defined in Article I as "the individual or entity that the Plan Administrator has designated as the Claims Administrator for the initial processing and determination of claims under the Plan."

Article III of the Plan provides the mechanics for determining disability. Section 3.1 provides:

The determination of whether an Employee is Totally Disabled shall be made in the sole discretion of the Plan Administrator, or in the sole discretion of the Claims Administrator if the Plan Administrator has delegated his power to make such determination to the Claims Administrator, based upon the material objective medical evidence that the Plan Administrator or Claims Administrator determines to be relevant to the Employee's claim.

Article V sets forth the administrative provisions of the Plan and gives the Plan Administrator the "discretionary authority and responsibility" to determine whether an employee is totally disabled; to grant or deny an employee's claim for benefits under the Plan; and to delegate, in writing, any of his responsibilities to other persons designated by him as he may deem necessary or appropriate. The Claims Administrator is given the "discretionary authority and responsibility" to process the acceptance or denial of an initial claim for benefits under the Plan and to decide all levels of appeals.

The last paragraph of Article V provides:

The determinations of the Plan Administrator and the Claims Administrator, or any of their delegates, as to any questions involving the administration and interpretation of the Plan, shall be final, conclusive and binding upon all persons claiming any interest in or under the Plan except any such decision that may be appealed under Article VIII of the Plan or as otherwise provided by law. It is intended that any discretionary actions to be taken under the Plan by the Plan Administrator or the Claims Administrator, and any such actions taken by each person to whom the Plan Administrator or the Claims Administrator has delegated its responsibilities under the Plan, shall not be subject to de novo review if challenged in court, by arbitration or in any other forum, and shall be upheld unless found to be an abuse of discretion by the Plan Administrator, the Claims Administrator, or any of their delegates.

On May 1, 1999, Bristol–Meyers and CORE entered into a Service Agreement for CORE to provide disability claims administrations, management and evaluation services under the Plan (the "Agreement"). The Agreement specifically provided that CORE would be responsible "for determining the eligibility of Covered Persons for payment under the Plan according to CORE's clinical judgment as allowed under the Plan" and that:

CORE shall serve as the final reviewer under the Plans to determine for all parties all questions relating to the payment of claims for benefits under the Plans. CORE shall have the discretion to construe and interpret the terms of the Plans and the authority and responsibility to make factual determinations. CORE shall be deemed to be the "appropriate named fiduciary" as defined by ERISA section 3(21) unless [Bristol–Myers], at its sole discretion, revokes in writing such designation of CORE as named fiduciary.

In June 1999, Bristol–Myers advised its employees by letter that CORE had replaced Unicare as the claims administrator for the Plan and provided the telephone number and address for CORE.

Plaintiff argues that the delegation of the claim administration duties by Bristol–Myers to CORE is ineffective because *Firestone* requires that the Plan itself must, in plain, clear terms, appoint CORE as claims administer for the grant of discretion to be effective. The court does not find support for this argument in *Firestone*. The language used by the court in *Firestone*, quoted above, requires that the Plan give the administrator or fiduciary discretionary authority to determine benefits. The Court did not specifically require that the Plan specifically identify the individual or entity that would serve as the administrator or fiduciary.

Here, there is no dispute that the Plan gives the plan administrator and the claims administrator discretion to determine eligibility for benefits. It also specifically authorizes the plan administrator to assign its authority to determine whether an employee is totally disabled to the claims administrator and to designate who is to serve as claims administrator. The Agreement delegates to CORE the plan administrators duty to determine all questions relating to the payment of claims for benefits under the Plan and names CORE as the appropriate named fiduciary under the Plan. The court finds that CORE was properly delegated the authority and discretion to determine whether an employee is totally disabled under the Plan. Accordingly, any review of CORE's decision that Plaintiff is not totally disabled will be reviewed under an abuse of discretion standard.

When reviewing an administrator's decision to deny benefits under an abuse of discretion standard, the court must consider:

whether the [administrator's] decision to deny benefits was (1) arbitrary and capricious; (2) not supported by substantial evidence in the record; or (3) erroneous on a question of law.

*Hancock v. Montgomery Ward Long Term Disability,* 787 F.2d 1302 (9th Cir.1986). Even though administrators are afforded broad deference in the review of their decision regarding eligibility for benefits, the court must still find that an administrator has abused its discretion in instances where a decision has been rendered without any explanation or in reliance on improper factors, where a decision is not supported by the evidence or is based on implausible reasoning or where the application of plan provisions is in clear conflict with the language of the plan. *Id.* Where a decision is adequately explained and supported by the record, the fact that the decision is directly contrary to evidence in the record does not automatically result in an abuse of discretion. *Taft v. Equitable Life Assurance Society,* 9 F.3d 1469, 1470 (9th Cir.1993).

## DISCUSSION

### Denial of LTD Benefits

In determining that Plaintiff was not totally disabled under the terms of the Plan, CORE disregarded recent findings by two of Plaintiff's treating physicians that he was no longer able to work at any occupation. On August 5, 1999, David L. Edmonds, a family practice physician that had been treating Plaintiff for two and a half years, represented that Plaintiff has chronic pain and is unable to sit through any of his college classes without getting up and moving around frequently during the class period. He also noted that, because of a learning disability and head injuries, Plaintiff was required to spend up to 50 hours a week studying in addition to his class time, and that Plaintiff com-

plained that this load was too much for him and that he intended to cut back. Dr. Edmonds stated that "At this point in time I do not think there is anything further that I can do for Mr. DeLeon. I do think that he has a long-term disability and even once he gets retrained may have trouble finding suitable employment." Dr. Edmonds also noted that the Oregon Department of Human Resources had determined that Plaintiff was "essentially unable to return to past work and does not have transferrable skills that would readily allow him to obtain other work." In chart notes prepared in early August, Dr. Edmonds states that:

> I do not see that he can hold any kind of a job at this point in time. If he gets one in the future, it will have to be very tolerant of his change of positions, getting up and moving around every 15–20 minutes. I will write the following to his Rehab counselor asking that possibly he can work a little less strenuously at school and stretch it out longer so that he does not have to set for as long.

On September 27, 1999, Dr. Edmonds reiterated his opinion that Plaintiff suffered from an impairment preventing him from performing any occupation.

Similarly, on September 8, 1999, James K. Warner, a chiropractor who had been treating Plaintiff since 1995, completed an impairment questionnaire that indicated that Plaintiff was able to continuously sit and stand for an hour at a time, and stand exclusively for 30 minutes at a time but that every 45 minutes, Plaintiff needed to walk for five to ten minutes and would need to take unscheduled breaks and rest 15–20 minutes once or twice a day. In an eight-hour work day, Plaintiff had the ability to sit for a total of two hours and stand/walk a total of two to four hours, to lift less than 10 pounds frequently, 10 to 20 pounds occasionally and never lift 50 pounds. Plaintiff ability to use his hands and fingers was unlimited but he was able to use his arms to reach for things only 20 percent of the workday, could twist from the waist 10 percent of the workday and could not bend from the waist for any appreciable period. Dr. Warner estimated that Plaintiff would miss work three times a month as a result of his condition and that his pain would interfere with his attention and concentration often to frequently. Dr. Warner's prognosis was guarded and he noted that Plaintiff "is worsening as he tries to integrate into protective society." A year earlier, Dr. Warner explained that:

> At this time, Mr. DeLeon it unable to perform any activities relating to, at least my understanding, his trained professions. His lifting ability is extremely limited, I would not recommend regular lifting over 10 pounds. Walking can be intermittently difficult, even riding in a car for long distances or for very much time causes him extreme pain and disability. Carrying even a sack of groceries can cause this gentleman severe problems. Our most recent complete physical capacity test was performed in 1996 and those records are enclosed. At that time you will notice that he has some usable upper arm strength with the floor lift and arm lift being very low he is constantly at risk. It should also be noted that the completion of this test caused him extreme symptomatic expression for over three weeks and necessitated near daily treatment after that examination.
>
> \* \* \* \* \* \*
>
> Currently I can think of no occupation that would be appropriate for him on an ongoing basis. I have enclosed also a copy of our April 1997 letter and I do not see that his condition has changed dramatically since that time.

The Ninth Circuit recently declared that when determining whether an

ERISA plan administrator has abused its discretion, the trial court must employ the "treating physician rule" that applies in Social Security Administration ("SSA") cases involving eligibility for disability benefits. *Regula v. Delta Family–Care Disability Survivorship Plan*, 266 F.3d 1130, 1144 (9th Cir.2001) The "treating physician rule" allows an administrative law judge to disregard the uncontroverted opinion of a treating physician only if he sets forth clear and convincing reasons for doing so. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). Furthermore, the absence of laboratory or clinical findings, in itself, is not a legitimate reason for rejecting the opinion of a treating physician; the ALJ must give specific reasons for finding the opinion inadequate, and must give sufficient weight to the subjective aspects of a treating physician's opinion. *Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir.1989).

▮ Defendant argues that the treating physician rule does not apply retroactively to the court's review of its decision in this case because the Ninth Circuit did not apply the rule to parties before it in *Regula*. The Supreme Court has held that when it "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). One justification for this rule is "that fairness requires that other similarly situated litigants receive equal treatment, not just the litigant whose case happened to be the one in which the rule was first announced." *MCI v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157,1164 (D.Or.1999).

▮ In *Regula*, the Ninth Circuit clearly and unequivocally held that the treating physician rule is applicable to a plan administrator's determination of whether a claimant is disabled. The only reason the Ninth Circuit did not apply the rule to the case before it was that the district court needed to reconsider the proper standard of review. However, it is clear that the Ninth Circuit intended the district court to apply the treating physician rule to the parties before it on remand. Once the Ninth Circuit issued the ruling and indicated its intent that the ruling should be applied to the case before it, the ruling became retroactive. It was only fair that all other claimants be entitled to the benefits of the treating physician rule once the Ninth Circuit determined that Regula should benefit from that rule.

Additionally, this court, even before the *Regula* decision, has held that the treating physician rule is applicable to ERISA claims based on disability. In *Palmer v. University Medical Group*, 994 F.Supp. 1221 (D.Or.1998), this court found that the "principles developed in our social security jurisprudence often are instructive in analyzing other disability claims" and used the treating physician rule in overturning the plan's decision to deny the claimant disability benefits. The court finds that the treating physician rule is properly applied to the ERISA claim presently before it.

In the initial decision to terminate Plaintiff's LTD Benefits, CORE represented that it had reviewed all of the clinical information submitted and that a CORE physician spoke with Dr. Edmond to discuss Plaintiff's condition. CORE indicated that "both Dr. Edmonds and the CORE MD have determined that you are able to do sedentary work with the following restrictions: No prolonged sitting or standing; should be allowed to change positions frequently." A transferrable skills analysis was completed which indicated that,

based on Plaintiff's training, work history, skills and aptitudes and his restricted physical work capacity, Plaintiff was employable. Accordingly, Plaintiff was found to. not be totally disabled and his LTD Benefits were terminated effective February 1, 2000.

On March 23, 2000, CORE upheld its previous denial of benefits relying on the information in the file and new information presented by Plaintiff. A CORE physician contacted Dr. Warner, who refused to discuss Plaintiff's case. Dr. Edmonds indicated that he had no additional information to provide. On June 19,2000, CORE issued its final opinion upholding the denial of LTD Benefits. Again, CORE reviewed all information in Plaintiff's file and any new information submitted by Plaintiff. The Appeal Board "agreed that the records do not support a cognitive impairment and that two key functional assessments indicated that the employee's ability to work ranged from light to medium physical capacity" and concluded that Plaintiff could work in a sedentary job.

These opinions clearly evidence that CORE did not even consider Dr. Warner's opinion and misconstrued Dr. Edmonds opinions. Dr. Warner apparently chose not to speak to CORE's physician. However, the record shows that Dr. Warner provided medical records and completed forms requested by CORE and unequivocally indicated that Plaintiff was totally disabled. CORE did not address these opinions. CORE represented that Dr. Edmonds agreed with CORE's physician that Plaintiff was able to do sedentary work. The record shows that even CORE's physician acknowledged that this ability was further restricted by Plaintiff's need to change position frequently and avoid prolonged sitting or standing. CORE ignored Dr. Edmonds statement that Plaintiff needs to change positions every 15 to 20 minutes and that, as of September 2000, he considered Plaintiff to be totally disabled.

Defendants argue that CORE considered Plaintiff's treating physician's opinion but rejected them because they did not provide CORE with any clinical findings that supported their opinions. CORE did not arrange for Plaintiff to have an independent medical examination. The CORE physician merely looked at the records before him and contacted Dr. Edmonds and Warner. The absence of clinical findings is not a sufficient reason to ignore a treating physician's opinion, especially if the physician upon which the administrator is relying merely reviewed the medical record and, therefore, also lacks any clinical findings upon which to base his opinion. In any event, CORE failed to address the treating physician's opinions and give clear and convincing reasons for its decision to disregard them.

Defendants also argue that the fact that Plaintiff was attending college and that vocational reports found Plaintiff employable were valid reasons for rejecting the treating physicians opinions. Again, neither the opinions, nor these reasons for rejecting them, were addressed in any of CORE's opinions. Also, the evidence clearly shows that Plaintiff's college load was too much and was causing him to aggravate his condition. Both treating physicians contacted Plaintiff's school to advise them that Plaintiff's needed to cut back on his school work. Also, the record provides evidence that Plaintiff was provided with a special chair to assist him in sitting in class for the entire period and that despite this assistance, Plaintiff still needed to get up and walk around two or three times during the class period.

The vocational reports provide different conclusions. Both the State of Oregon and the vocational expert hired by Plaintiff found Plaintiff to be totally disabled. The

vocational expert hired by Defendants relied on information not totally supported by the record and is not adequate evidence to justify disregarding the opinions of two treating physicians.

The court finds that Defendants failed to properly consider the opinions of Plaintiff's treating physicians, both of whom found Plaintiff to be totally disabled. Based upon this error, as well as the issues that exist with regard to the evidence relied upon by CORE in making its decision to terminate benefits, I find that CORE abused its discretion by failing to consider all of the relevant evidence and the relevant factors and by discounting the opinions of Plaintiff's treating physicians in favor of the opinion of a non-examining physician without articulating an adequate basis for doing so.

▆▆ Defendants argue that, at this point, the court must remand the matter to allow them to consider the evidence in the appropriate manner and cites to *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455 (9th Cir.1996) as support for this argument. *Saffle* stands for the proposition that remand for reevaluation of the merits of the claim is the correct course to follow when an ERISA plan administrator, with discretion to apply plan, has misconstrued the plan and applied a wrong standard to a benefits determination. Construction of the Plan is not at issue in this matter. The questions before the court are limited to evidentiary issues and whether, based on the record before it, CORE abused its discretion in terminating Plaintiff's LTD Benefits. Accordingly, the court reverses the decision of Defendants and directs Defendants to award Plaintiff LTD Benefits effective February 1, 2000. The court advises the parties that this decision applies only to LTD Benefits for the period in question and does not prohib-

it Defendants from reviewing Plaintiff's claim for future LTD Benefits.

**Failure to Provide Documents**

Plaintiff seeks $100 per day for the 261–day period from July 17, 1999, through April 3, 2000, as a penalty against Defendants for their failure to produce certain documents in response to a written request from plaintiff's counsel. Defendants contend that they were not the plan administrator and were not obligated to provide a copy of the Plan to Plaintiff under ERISA. Alternatively, Defendants assert that the failure to provide Plaintiff with a copy of Plan until March 1, 2000, was harmless.

On June 2, 1999, CORE advised Plaintiff that it intended to review his claim for LTD Benefits and asked him to provide information, releases and records for their review. On June 17, 1999, Plaintiff's counsel responded to CORE and requested a copy of the Plan and the Summary Plan Description (the "Summary") and reminded CORE that they were obligated under ERISA to provide him a copy of these documents within 30 days.

On July 17, 1999, Plaintiff's counsel advised CORE by letter that they have failed to provide him with the requested documents within 30 days and were now incurring penalties of up to $100 per day and impliedly reiterated his request for the documents. On July 29, 1999, Plaintiff sent another letter to CORE to express his concern that Plaintiff's LTD Benefits had been cancelled, to formally appeal that decision and to request, among other things, a copy of the Plan.

On August 17, 1999, CORE responded with:

We are in receipt of your letter dated July 29, 1999, requesting a copy of the Summary and Plan. Future requests for the Summary and Plan document should

be made directly to Michelle Dinoff, the Manager, Disability Programs. The request is associated with charges of .25 cents per page. However, CORE has referred your queries directly to Bristol–Myers and Bristol–Myers will be waiving this fee and forwarding you a copy of the Summary Plan documents. CORE's first opinion letter terminating Plaintiff's LTD Benefits was forwarded on December 21, 1999. Plaintiff's counsel responded to this letter on December 29, 1999, and notified CORE that he intended to appeal that decision. He also indicated that he had an outstanding request from September 14, 1998, directed to UNI-CARE, the former claims administrator for the Plan, for Plaintiff's entire claim file and he requested copies of the entire claim file for the current review of Plaintiff's LTD Benefits. CORE referred this letter to its own legal counsel who quoted the Plan's claims procedure process for Plaintiff and promised to provide Plaintiff with a complete copy of his medical and administrative even though "neither the Plan nor federal law entitles your client to the documentation you have requested at this point in time."

On February 11, 2000, Plaintiff's counsel wrote to CORE's legal counsel to confirm a telephone conversation in which CORE's legal counsel advised that he would not send Plaintiff's counsel a copy of the Plan or Summary and that Plaintiff's counsel should contact Bristol–Myers directly. The letter continues:

There is a problem here with your suggestion. Under Oregon ethics code, once a party is represented by counsel, opposing counsel is not allowed any contact with the opposing party. I take if from your communications that you represent both Bristol–Squibb and CORE together. Thus, as I asked and you responded previously, "all communications should be routed through your office."

In that regard, as you know, ERISA requires the Plan Administrator to produce a copy of the Plan document and Summary Plan Description upon request of a beneficiary. Consider this letter, my former e-mail to you and my former phone message to you such a request. I am making this specific request so I can examine the definition of disability in the plan in preparation of my client's appeal of CORE's denial of benefit payment. This is a reasonable request, and one mandated by federal law which I hope you will honor.

In the alternative, I do have a copy of the 1991 Bristol–Meyers Plan, and if you will assure me in writing that the Plan document has not changed and is still applicable to Mr. DeLeon's determination, then that assurance will be adequate and no further response will be necessary other than your production of the complete administrative file.

A letter dated February 11, 2000, to Plaintiff's counsel from the office of CORE's legal counsel indicates: "Enclosed please find the documents that you requested regarding Mr. DeLeon." On the same date, CORE's legal counsel advised Plaintiff's counsel that he represented only CORE, and did not represent Bristol–Myers.

On February 18, 2000, Plaintiff's counsel confirmed, by letter, receipt of the administrative file and advised CORE's legal counsel that "I still do not have the current Plan documents which provide the Plan's definition of disability (I have sent in a request for these documents from the Plan Administrator)." On that same date, Plaintiff's counsel sent a letter to the Plan Administrator for Bristol–Myers requesting a copy of the Plan and the Summary. On March 1, 2000, the Manager for the disability program for Bristol–Myers forwarded by Federal Express, Overnight

Mail, a copy of the Plan and the Summary, as well as the Company Disability Program pamphlet, to Plaintiff's counsel.

On March 14, 2000, Plaintiff's counsel acknowledged receiving copies of the Plan and the Summary but complained that he had not received any document in which the Plan Administrator delegates responsibility to CORE for the administration of claims. Additionally, Plaintiff's counsel complained that the administrative record that he received was incomplete.

On April 3, 2000, CORE faxed to Plaintiff's counsel the clinical case notes that were missing from the administrative file. It is unclear from the record when, if ever, Bristol–Myers or CORE provided Plaintiff's counsel with a copy of the Agreement.

■■■ 29 U.S.C. § 1133 provides that:

In accordance with regulations of the Secretary, every employee benefit plan shall:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

If most ERISA benefits decisions are to be reviewed only for abuse of discretion, upon the record established below, then these requirements assume added importance. The Plan's internal review process may be the claimant's last genuine opportunity to influence the final decision, to supplement the record in preparation for judicial review, or to correct any errors in the existing record. Meaningful participation in this internal review process therefore requires that the claimant have an opportunity to review the relevant documents in the claim file so the claimant may submit any additional documents, correct any errors in the record, point to any favorable evidence that would tend to support the claim, fully understand the reasons for the decision that is being appealed, and to otherwise prepare an informed response to that decision.

To implement 29 U.S.C. § 1133, the Secretary has promulgated 29 C.F.R. § 2560.503–1(h)(1), which requires that:

Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

The regulation further provides that claim procedures adopted by a plan will not be deemed to provide a claimant with opportunity for a full and fair review unless the plan:

Provide[s] that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

"Relevant documents" include those relied upon by the fiduciary in making a decision, as well as those submitted, considered or generated in the course of making a decision, whether relied upon or not.

29 U.S.C. § 1132(c)(1) provides, in relevant part, that:

Any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters

reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

■ As noted above, Defendant's first contention is that Section 1132(c)(1) permits penalties to be assessed only against the "plan administrator." 29 U.S.C. § 1002(16)(A) defines the term "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated" or, "if an administrator is not so designated, the plan sponsor . . ." The Plan designates the "Corporate Senior Vice President, Human Resources of Bristol–Myers" as the "plan administrator." Bristol–Myers also is the Plan's sponsor. At first glance, that might seem to preclude any liability for the Plan · or CORE.

In the instant case, however, Bristol–Myers delegated the entire claims process to CORE as the claims administrator and designated CORE as the plan "fiduciary." Bristol–Myers advised Plaintiff in June 1999, that CORE had been appointed as the claims administrator and provided him with CORE's address and telephone number. CORE contacted Plaintiff directly to advise him that it intended to review Plaintiff's claim for LTD Benefits. Thereafter, all communications concerning Plaintiff's claim were with CORE or CORE's legal counsel. It was CORE that reviewed Plaintiff's claim and made the decision to deny benefits. The notice terminating benefits was on CORE's letterhead. It was also CORE to whom Plaintiff appealed that decision, and to whom any additional evidence or argument was to be submitted.

CORE made the final decision to deny plaintiff's appeal, and the notice denying that appeal was on CORE's letterhead. Plaintiff's request for the Plan and the Summary, which he asserted he needed to pursue his claim, was initially submitted to CORE, who purported to make arrangements for Bristol–Myer to furnish them. Similarly, Plaintiff's request for a copy of his medical and administrative records were made directly to CORE.

This court has previously intimated that, under these circumstances, CORE is liable as the plan administrators delegate for failure to provide pertinent copies to claimants within 30 days of the claimant. In *Palmer*, this court reasoned that:

> When the plan administrator has expressly delegated to a third party the performance of certain duties, and participants have been instructed to direct all communications to that delegee, arguably the latter has assumed responsibility for performing those duties and may be held liable for the failure to do so. See *Rosen v. TRW, Inc.*, 979 F.2d 191, 193–94 (11th Cir.1992) (where named administrator had delegated duties to alter ego who was actually administrating the plan, the latter could be held liable for breach of those duties); *Law v. Ernst & Young*, 956 F.2d 364, 372–73 (1st Cir.1992) (company could be held liable under § 1332(c)(1) for failing to timely furnish requested information where it "had assumed and controlled the plan administrator's function of furnishing required information in response to a plan beneficiary's request.") But *cf. McKinsey v. Sentry Ins.*, 986 F.2d 401, 404–05 (10th Cir.1993) (actions of delegee are imputed to named plan administrator, but only the latter may be held liable).

The court did not directly find that the claims administrator was liable for failure

to provide the claimant with her claims file because it found that the claimants request was made too late for the documents to have been of any use in her appeal. However, the reasoning of, and the cases relied upon by this court in *Palmer*, convince this court that CORE, as Bristol–Myer's delegate and named "fiduciary" for the Plan, is liable for its failure to provide Plaintiff with the documents it requested on a timely basis.

■ Plaintiff's counsel first requested copies of the Plan and the Summary on June 17, 1999, He asserts that under ERISA, he was entitled to receive the copies on or before July 17, 1999. The statute upon which Plaintiff relies, however, does not create a right to receive copies of documents until after a claim has been denied. Section 1133(2) requires that every employee benefit plan provides its claimants that have been denied benefits with a reasonable opportunity for a full and fair review of that decision.

The decision to terminate Plaintiff's LTD Benefits was not made until December 21, 1999. Accordingly, the court find that Plaintiff's right to copies of the Plan, the Summary and his claim records under Section 1133 did not accrue until that date. This construction of Section 1133 is supported by the regulations relied upon by Plaintiff, which require all plans to provide claimants with a reasonable opportunity to appeal an adverse benefit determination.

■ The record is unclear when Plaintiff's counsel first requested a copy of the Plan and the Summary after the December 21, 1999, decision to terminate Plaintiff's LTD Benefits. On December 29, 1999, Plaintiff's counsel requested copies of "the entire administrative file, which includes all medical documents, all vocational documents and all internal memoranda reflecting any and all of the information and processes that both Unicare, CORE and Bristol–Myers Squibb have used to sub-

stantiate the final decision of denial of benefits for Mr. DeLeon." However, no request was made for the Plan or the Summary. On February 11, 2000, Plaintiff's counsel thanks CORE's legal counsel for indicating, that it will not provide a copy of the Plan or the Summary. This is the first evidence that Plaintiff specifically requested those documents. The record shows that Plaintiff received copies of the Plan and the Summary on March 1, 2001, which is well within 30 days of the February 11, 2000 date. Accordingly, based on the record before the court, Plaintiff received the requested copies of the Plan and the Summary in a timely manner.

■ Plaintiff also asserts that he is entitled to the penalty for CORE's failure to provide him with his complete administrative file in a timely manner. Plaintiff's counsel first requested that file from CORE on December 29, 1999. CORE referred the letter to its legal counsel who advised Plaintiff's counsel on February 7, 2000, that they would provide the administrative file. Core's counsel forwarded the majority of Plaintiff's administrative file to Plaintiff's counsel on February 11, 2000, and on February 18, 2000, Plaintiff's counsel confirmed, by letter, receipt of Plaintiff's administrative file. However, the file was not complete and Plaintiff's counsel did not receive all of the relevant documents until April 3, 2000. Accordingly, the court finds that CORE was 65 days late (from January 28, 2000, to April 3, 2000) in providing Plaintiff with all of the relevant documents in his administrative file.

Defendants argue that Plaintiff has failed to establish that he was prejudiced in any way by CORE's failure to act in a timely manner to Plaintiff's request and that an assessment of a penalty by this court is inappropriate. Defendants reliance on *McKenzie v. General Telephone*

*Company of California,* 41 F.3d 1310 (9th Cir.1994) in support of this argument is misplaced. In *McKenzie,* the Ninth Circuit held that a plan's failure to provide a summary of the plan to a claimant, when the claimant had been provided a copy of the plan when he filed his claim and set forth the standards for total disability in his denial letter, did not result in substantive harm and did not preclude the application of the total disability or any occupation standards. *Id.* at 1315.

*McKenzie* is easily distinguishable from the facts at hand. Here, we have a failure to provide relevant documents from Plaintiff's administrative file, which CORE, at least in part, actually relied on in deciding to terminate Plaintiff's LTD Benefits. *McKenzie* involved a failure to provide a summary plan description when the plan had already been provided. Also, Plaintiff asserts that Defendants violated a specific statute which was not the case in *McKenzie.* The statute which imposes the penalty for failure to provide a claimant with documents relevant to their appeal within 30 days of the date requested does not contain any defense based on lack of prejudice and the court declines the invitation to create one.

The court finds that CORE violated Section 1133 by failing to provide Plaintiff his administrative file on a timely basis. However, the records shows that CORE provided the majority of the administrative file to Plaintiff on February 11, 2000, and quickly remedied its failure to provide all of the file once its omission was brought to its attention. Accordingly, the court finds that CORE should be penalized $100 per day for the first 14 days of its violation (January 28, 2000, through February 11, 2000) and $50 per day for the remaining 51 days of its violation (February 12, 2000, through April 3, 2000).

## CONCLUSION

Defendants' motion (21) for partial summary judgment is DENIED and Plaintiff's motion (25) for summary judgment is GRANTED, in part, and DENIED, in part. Defendants' decision to terminate Plaintiff's LTD Benefits is REVERSED and the court directs Defendants to award Plaintiff LTD Benefits effective February 1, 2000. Additionally, the court assesses a $2,550 penalty against CORE for violation of 29 U.S.C. § 1133(b).